No. 103,785

STATE OF KANSAS, *Appellee,* v. CORKY A. WILLIAMS, *Appellant.*
(324 P.3d 1078)

510

Opinion filed May 23, 2014.

*Michael P. Whalen,* of Law Office of Michael P. Whalen, of Wichita, argued the cause and was on a supplemental brief for appellant, and *Bonnie Boryca,* of Joseph & Hollander LLC, of Topeka, was on the other briefs for appellant.

*Jodi E. Litfin,* assistant district attorney, argued the cause, and *Chadwick J. Taylor,* district attorney, and *Derek Schmidt,* attorney general, were with her on the briefs for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Corky A. Williams appeals his convictions for the premeditated first-degree murder of James Earl Dyer, Jr.; conspiracy to commit first-degree murder; and criminal possession of

a firearm. Williams raises numerous issues. We have reorganized and combined some issues. As restated, Williams' arguments require us to consider: (1) whether the evidence was sufficient; (2) whether the complaint was insufficient when the aiding and abetting theory was not specifically pleaded; (3) whether the theory of aiding and abetting presented an alternative means of committing a crime; (4) whether there was a violation of Williams' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as guaranteed by *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); (5) whether alleged prosecutorial misconduct denied Williams' right to a fair trial; (6) whether Williams' right to confront witnesses was violated; (7) whether there were multiple errors in the jury instructions; (8) whether Williams was denied a fair trial because of witness and juror misconduct; (9) whether the trial court erred in admitting a demonstrative photograph; and (10) whether errors accumulated to deny Williams a fair trial.

After reviewing Williams' arguments, we find only one error— an instance of prosecutorial misconduct. But we conclude that error is not a basis for reversing Williams' convictions.

## FACTS AND PROCEDURAL BACKGROUND

Dyer died from gunshot wounds he suffered on August 10, 2007, in Topeka. Williams and three other individuals—Drake Kettler, Jr.; Kelvin Phillips, Jr.; and Antonio Armstrong—were charged with and convicted of crimes related to the death. All four defendants appealed, and their individual appeals were argued the same day. For these related opinions, see *State v. Kettler*, 299 Kan. 448 *State v. Phillips*, 299 Kan. 479, 324 P.3d 1095 (2014); and *State v. Armstrong*, 299 Kan. 405, 324 P.3d 1052 (2014).

The appeals of Williams, Kettler, and Phillips, who were tried jointly, raise many of the same issues. Consequently, our opinions in these cases are largely repetitive. We have followed this format for the ease of reading only one opinion; the reader will not need to refer to multiple opinions. For the benefit of anyone who wishes to read all three opinions, we offer as a guide that Williams has asserted the most issues. Kettler and Phillips have repeated some

of those issues, making either identical or substantially similar arguments. Phillips does, however, present an issue not raised by Kettler or Williams—his first issue, which relates to the procedure for declaring a mistrial. Also, although Williams, Kettler, and Phillips all raise issues regarding the sufficiency of the evidence and the prosecutor's misstatement of the definition of "premeditation" during the closing argument, there is some variance in the analysis because of each individual's role in the shooting of Dyer. The decision in Armstrong's appeal does not have the same level of overlap, and some factual details differ because of the variance in evidence in his separate trial.

*Procedural History*

The charges against the four defendants were not identical. Phillips, like Kettler and Williams, was charged with premeditated first-degree murder, in violation of K.S.A. 21-3401(a); conspiracy to commit first-degree murder, in violation of K.S.A. 21-3302 and K.S.A. 21-3401; and criminal possession of a firearm, in violation of K.S.A. 21-4204(a)(4)(A). Armstrong was also charged with premeditated first-degree murder and criminal possession of a firearm.

Armstrong's case took a different procedural track when, before any of the defendants' preliminary hearings, he decided to cooperate with the State in exchange for a favorable plea agreement. Initially, in Armstrong's first contact with investigating law enforcement officers, he denied any knowledge of or involvement in the shooting. Later, in his attempt to obtain the plea agreement, he gave a sworn deposition-style statement to the district attorney in which he incriminated himself and implicated the other three defendants in the premeditated killing of Dyer. Based on this statement and as part of Armstrong's plea arrangement, the State called Armstrong as a witness at a joint preliminary hearing related to the charges against Williams, Kettler, and Phillips. Armstrong reiterated the truthfulness of his sworn statement and testified that he had joined with Williams, Kettler, and Phillips in a plan to find and shoot Dyer.

Before Williams, Kettler, and Phillips were brought to trial, Armstrong changed his mind about cooperating with the State and recanted his statements and testimony, even though he lost his plea deal. In a notarized affidavit drafted by Armstrong, he stated that his former defense counsel coerced him into making his prior statements implicating his friends.

Subsequently, Armstrong's case was joined with the cases of Williams, Kettler, and Phillips for the purposes of a jury trial. The resulting joint trial ended with a hung jury. After the first trial, the trial court severed Armstrong's case from the others, and his second trial took place before the three other codefendants again went to trial. Armstrong testified at his second trial, providing yet another version of how Dyer was shot. Armstrong was convicted of premeditated first-degree murder and criminal possession of a firearm, the only charges brought against him.

The State then called Armstrong to testify at the joint second trial of Williams, Kettler, and Phillips. Armstrong testified that both his sworn statement and his preliminary hearing testimony against the other defendants were untrue. Armstrong explained that he had incriminated his friends because he was led to believe that "my homeboys, my brothers, was testifying on me, which I found out later was a lie." He also told the jury that he had just reiterated a story the prosecutor had fed him. Armstrong's explanation was refuted by Armstrong's attorney, who testified that Armstrong was not told what to say in his sworn statement.

Although Armstrong was called as a witness for the State at the trial of Williams, Kettler, and Phillips, he was declared a hostile witness. During his testimony, Armstrong wore a mask to prevent him from spitting on the law enforcement officers who transported him to the courtroom or on those in the courtroom. He often cursed, and he usually either refused to answer questions or was evasive and claimed he could not remember details. Eventually, on redirect examination, Armstrong became so belligerent and uncooperative with the prosecutor that he was removed from the courtroom.

As this history suggests, the jury was presented with multiple versions of the events that led to Dyer's death. In addition to Arms-

trong's various renditions of what happened, both Williams and Phillips testified at their second trial and offered slightly different versions of events. Plus, approximately a month before the second joint trial, Phillips proffered the substance of his trial testimony in order to obtain some pretrial evidentiary rulings; the jury would learn that some details included in the proffer differed from Phillips' trial testimony. Kettler chose not to testify. The jury also heard the testimony of several individuals who witnessed some portion of the events, investigated the crimes, or had information about the relationship of Dyer and the defendants. Because Phillips attacks the sufficiency of the evidence against him, we will discuss the evidence in some detail.

### Dyer's Conflict with the Defendants

Through the testimony of several witnesses—including Williams and Phillips—and Armstrong's sworn statement, the jury learned of a dispute between Williams and Dyer that occurred several weeks before Dyer's death. During this altercation, an argument escalated and ended with Dyer and his friend, Ryland Patton, robbing Williams at gunpoint. Patton testified that after the robbery, Williams issued a challenge by telephoning and saying, "It's on." Patton's testimony was countered by Williams, who told the jury he had decided just to stay away from Dyer and Patton. He denied that Dyer's death had anything to do with the prior encounter.

In turn, Williams' testimony was contradicted by Armstrong's sworn statement and the preliminary hearing testimony of Armstrong. According to that version of events, Williams told Armstrong and Kettler about the robbery immediately after it happened. The three men decided they would be on the lookout for Dyer and his friends. When Armstrong was asked whether there were any plans made to search for Dyer, Armstrong replied, "No. Just—just when we—when we saw him, shoot him." Armstrong was asked if that agreement would apply "to any of the three of you?" He answered, "Any of us . . . . I'm not going to lie, I wanted to do it because not too—not too long after that, just a couple of days after that . . . somebody shot . . . [a friend's house] and grazed me on my arm." Armstrong believed Dyer and Patton were the shooters.

Phillips did not participate in these discussions because he was in jail. Nevertheless, according to Armstrong, Kettler informed Phillips of the plan by speaking to Phillips in "code" during a telephone conversation. As it turned out, Phillips was released from jail the same day as Dyer was shot. According to Armstrong, Phillips joined in the plan to find and shoot Dyer. Armstrong stated that when they found Dyer, they wanted to "[b]low his head off."

*Phillips Spots Dyer; Other Defendants Join Him*

Within hours of Phillips' release from jail, he spotted Dyer and Dyer's girlfriend, Teri Johnson, outside a liquor store and an adjoining smoke shop. Johnson testified that she and Dyer had walked to the liquor store where they ran into some people they knew, Rhonda Shaw and Leonard Mun. Johnson asked Shaw for a ride, and Shaw agreed. While Shaw shopped, Johnson walked from the liquor store toward Shaw's car. At that point, Phillips approached Johnson and asked if she was "straight," meaning did she need to buy any drugs. Johnson told him she did not. As Johnson got into the car, where Mun and Dyer were already sitting, Phillips told her to take his phone number and to call if she needed something.

Phillips testified that, after talking to Johnson in front of the liquor store, he talked to Shaw and asked her whether she wanted to purchase some drugs. Shaw indicated she had some money at her house, so she would buy drugs if Phillips stopped by. Phillips told Shaw he would be there within 5 to 10 minutes.

According to Phillips, after Shaw's vehicle pulled away, Phillips called Kettler, and Kettler and Armstrong met him in the alley behind the liquor store and smoke shop. They ran down the alley because Phillips was in a hurry to get to Shaw's house so that another drug dealer would not beat him to the sale. Kettler then called Williams to ask for a ride to Shaw's house.

Williams also testified that Kettler called him and asked Williams to give Kettler, Phillips, and Armstrong a ride to Shaw's house. According to Williams, he had been with Kettler and Armstrong earlier in the day. He explained that he had picked up Kettler, Armstrong, and another friend and they drove around for about

30 minutes. Then Kettler and Williams installed a CD player in Williams' car, while the others were "sitting around talking." Later, the group went their separate ways until Williams picked up the others to take them to Shaw's house. He explained that he was told the men wanted to go to Shaw's house because she owed Kettler some money and Phillips was going to sell her drugs.

According to Armstrong's sworn statement, Kettler and Williams had picked him up earlier in the day and the three were still together when Phillips called. Like Williams, Armstrong stated that Kettler and Williams had installed a CD player in Williams' car, but Armstrong also indicated that while doing so they had hidden a gun behind the CD player. Armstrong explained, "Like where the CD player is in Oldsmobile Delta's [sic] you can take that whole part out, the whole vent part out and you can fit a nice size gun in there." Armstrong described the hidden gun as a "9 mm Ruger." There was evidence at the trial suggesting that this gun was later used to shoot Dyer.

Once Williams and Kettler finished installing the CD player, according to Armstrong, the three men began driving around. Phillips called Kettler, and Kettler then told the others that Dyer "is at the smoke shop. Get there. And then [Kettler] opened the vent and pulled a gun out of the vent." Williams drove directly to the alley behind the store, which Armstrong said was merely 30 seconds or so away from where they were. Once they were near the store, Armstrong and Kettler jumped out of the car and started running down the alley. Phillips ran toward them and told them Dyer was on his way to Shaw's house. They turned and ran back toward Williams' car.

The timing of Armstrong's version of events meshes with Johnson's account. She saw Phillips and three or four other people running down the alley behind the liquor store as Shaw drove away.

*Events at Shaw's House, According to Johnson and Mun*

Once Shaw, Mun, Dyer, and Johnson arrived at Shaw's house, they carried beer inside and began hanging out. About 5 to 10 minutes after they sat down, Shaw's home phone rang. Shaw answered the phone and simply said, "Yeah, yeah," and then passed

the phone to Mun. According to Mun, there was nobody on the other end, so he hung up. Other evidence suggested that either Phillips or Kettler used Phillips' cell phone to call Shaw to verify whether Dyer was at her house. Mun indicated that shortly after the phone call, Shaw asked Dyer if he was J.D., to which Dyer answered, "Yes."

Within a couple minutes of the phone call, there was a knock at Shaw's front door. Mun walked up to the door and asked, "Who is it?" The person on the other side responded, and Mun told the others it was "Little Man," which was Kettler's nickname. When Dyer heard "Little Man," he jumped up and left the room.

Mun looked out the window and did not initially see anyone. When he opened the door, Mun heard someone coming around the side of the house, asking why he had not answered more quickly. As the man approached Shaw's front door, Mun recognized him as Kettler. Phillips and Armstrong came toward the front door from the side of the house, and the three men ran into the house. Phillips got in Johnson's face, asked something like, "[W]here's he at, Bitch?" meaning Dyer. Johnson acted like she did not know who Phillips was looking for because she "didn't want [Phillips] to do nothing to [Dyer]." Phillips then turned around and walked out the front door.

Seconds later, Phillips returned to the house. According to Johnson, Kettler and Armstrong were with him and all three men had guns when they walked past her and moved toward the back of the house. Johnson immediately ran out of the house to get help.

Mun, who remained outside the front door, did not see guns when the group, which, according to him, now included Williams, walked into the house the second time. Mun testified that he heard "tussling" and "wrestling" sounds coming from inside Shaw's house. He stepped inside and saw one of the men pick up a drinking glass and glass ashtrays and throw them into the bedroom. Then Mun heard the "pop, pop, pop" sound of gunshots and watched the four men run out of the house. When Mun looked into the bedroom, he saw Dyer lying on the floor, unresponsive.

Meanwhile, Johnson ran to a neighbor's house and knocked on the door. When the neighbor responded, Johnson asked her to call

law enforcement. Johnson then heard gunshots, so she ran back to Shaw's house. As she approached, Johnson saw the same men run out of Shaw's house, jump into a brown car, and drive away. This car was later identified as Williams' car.

Johnson went inside Shaw's house and found Dyer lying on the bedroom floor, bleeding and unresponsive. Dyer had been struck by two bullets, one of which entered through his arm and pierced his heart. In addition to the bullet wounds, Dyer suffered head wounds and a bite mark on his left shoulder. An expert opined that Phillips was the probable biter.

The jury did not hear Shaw's versions of events because she had passed away before the first trial, and, as we have noted, Kettler chose not to testify. But, just as Williams, Phillips, and Armstrong provided different versions of what happened before the men got to Shaw's house, they provided very different accounts of what occurred once they arrived.

*Williams' Version*

According to Williams, he drove over to Shaw's house with Kettler, Phillips, and Armstrong because Shaw owed Kettler money and because Phillips said "he needed to take care of some business over there," meaning a drug deal. When they pulled up at Shaw's house, Williams dropped off the other men. He then drove past the house before turning around and coming back to park. Williams said he was parked about a minute when Kettler came out the front door and got into Williams' car. Then Williams heard gunshots coming from inside Shaw's house. Seconds later, Williams saw Phillips and Armstrong running out of the house. When they got into the car, Williams noticed "a few blood spots" on Phillips' shirt. Williams asked, "What's going on?" but they just told him to "drive off." So Williams drove over to the home of Latoya Austin, Armstrong's girlfriend.

Williams testified that he did not see a gun, but when they went inside Austin's house he heard Austin tell Armstrong to "get that out of here," referring to the gun Armstrong was then holding. Williams saw Armstrong leave the house for a couple minutes, presumably to get rid of the gun. Then Armstrong started talking about

what had happened at Shaw's house and indicated that Phillips shot Dyer. Phillips and Armstrong talked about "tussling over the gun" with Dyer. They told Williams that Dyer tried to get the gun from Phillips and Dyer had hopped on Phillips' back.

## Phillips' Version

Phillips' testimony was consistent with Williams', at least in many respects. According to Phillips, his "whole intention was to go over there [Shaw's house] to bust a serve," which he explained meant to complete a drug sale. Phillips denied having any discussion before arriving at Shaw's house about settling a score with Dyer. In fact, according to Phillips, he did not know about Dyer's robbery of Williams until after Dyer's death. On the way to Shaw's house, Phillips called Shaw to make sure she and Mun were there. Phillips testified that he did not see any guns and did not know whether Williams had hidden a gun in the dashboard of the car.

Phillips said Kettler went up to Shaw's house first, knocked on the door, and announced that it was "Little Man." Mun, who answered the door, mentioned that Dyer had run out the back. Phillips indicated he was not sure why Mun told them about Dyer. Armstrong then went around the side of the house, and Phillips and Kettler went inside. After Phillips completed his drug sale, Armstrong entered the house and began asking where Dyer was because he had not found Dyer behind the house. Next, Armstrong ran through the house, toward the back rooms, and Johnson stood up and ran out the front door. Phillips testified that he tried to get Armstrong to leave, but then he heard "some tussling" and saw Dyer and Armstrong wrestling over a gun. Phillips did not know who brought the gun to Shaw's house, but he assumed it was Armstrong; he specifically denied carrying a gun into Shaw's house himself.

Phillips told the jury that he was not going to let Dyer hurt his friend, so he tried to break up the fight. When his initial efforts did not work, Phillips started hitting Dyer "in his face area." These efforts did not stop Dyer, so Phillips grabbed an ashtray out of the living room and hit Dyer over the head several times. Phillips also bit Dyer. During this time, according to Phillips, Kettler also tried

to break up the fight. At some point, Kettler yelled, " 'Come on, let's get out of here. We didn't come over here for this." Kettler then ran toward the front of the house, and Phillips assumed Kettler left.

As the struggle continued, Dyer dropped the gun. Phillips picked it up, but in the process the gun went off. Phillips ran into the bedroom, and Dyer jumped on his back. This caused Phillips to stumble and "[t]wo shots went off." Phillips broke lose from Dyer, and as Dyer "was falling, I let like two more shots go." Phillips testified that the gun was still in his hand when he got into Williams' car and he threw it on the back seat. When asked whether it was his intention to shoot Dyer, Phillips testified, "No, it wasn't. I had no reason to. I don't believe I would have had a reason. That's not my style."

*Armstrong's Versions*

Armstrong's sworn statement included some of the same details. There were significant differences, however, including his explanation of why the four went to Shaw's house, which was to "[b]low Dyer's head off." He also stated that he initially carried the gun that had been removed from the dash of Williams' car, but, after the men could not find Dyer in Shaw's backyard, Phillips grabbed the gun from Armstrong and entered the house. Armstrong, Kettler, and Williams followed. The fight initially involved Kettler, Phillips, and Dyer while Williams stood nearby. During the struggle, Kettler had Dyer briefly subdued, but then Dyer got loose and jumped on Phillips' back. At that point, Armstrong started hitting Dyer's head with a glass ashtray and Dyer fell. After Dyer hit the floor, Phillips "backed up and I [Armstrong] started backing up just to make sure that, you know, . . . wasn't no chance I would get hit by the bullets because I already knew what was about to happen at that split second and that's when [Phillips] just started shooting." Phillips "was shooting to kill, but it was like he was kind of shooting kind of wild . . . like he was just trying to hit him everywhere." After the shots were fired, Phillips ran out of the house. Armstrong followed him and saw Kettler in the kitchen doorway with a knife. Armstrong stated that after the struggle moved from the bathroom

to the bedroom, Kettler went to the kitchen. "I guess before he got the knife, [Phillips] shot [Dyer]."

A transcript of Armstrong's testimony from his own, separate trial was also admitted into evidence at the trial of Williams, Kettler, and Phillips. This version of events put yet another spin on the facts. Armstrong indicated that he, Williams, Kettler, and Phillips went to Shaw's house to collect money that Shaw owed to Kettler. After all four men went into the house and Shaw paid Kettler, they heard the sound of a curtain being snatched back, and saw Dyer "came out [of] the bathroom with a black gun in one hand and a silver gun in the other." Dyer said, "[Y]ou-all drop out," meaning everyone give him their "property." Phillips was able to hit Dyer "so hard that one gun flew out of his hand and hit the wall so hard that the clip fell out of it." Kettler and Phillips "lunged after the other gun." After wrestling around and after Armstrong hit Dyer on the head with an ashtray, Phillips tried to run away, but Dyer ran after Phillips and "grabbed him by the back of his neck." So Armstrong grabbed Dyer and hit him again three times, causing Dyer to drop to the floor. That is when Phillips "came out of nowhere" and "started shooting" at Dyer. Phillips, Kettler, and Armstrong ran out of the house.

On Armstrong's way out of the house, he saw Williams leaning down to pick up the first gun that Dyer had dropped. He did not see what happened to the gun after that. Williams followed Armstrong out of the house, and the four friends drove away in Williams' car. According to Armstrong, they did not plan to kill Dyer: "We did not go over there intending to kill him. We didn't have a gun to go over there to kill him with. He got shot with his own gun."

*Other Evidence*

In other evidence, jurors heard from some of Shaw's neighbors who described a car that matched the description of Williams' car as being near Shaw's house at the time of the shooting. One couple was following Williams' car through the neighborhood. They reported seeing three men get out of the car and approach Shaw's house; one of the men walked to the door and the others ran around the side of the house, which made the couple suspicious.

Meanwhile, the driver pulled forward, turned around, and parked. The description of the driver they provided was consistent with Williams' appearance. After the shooting, another neighbor saw "three or four" men run out of Shaw's house and get into a parked car.

The jurors also heard the testimony of Renee Stewart, who testified that Williams and Kettler came to her house the night Dyer was shot. Based on things that were said, Stewart concluded Williams had shot someone. She reported that he seemed very nervous, and he wiped down a 9 mm pistol and some ammunition and asked her to hide the gun. She later sold the gun for drugs. She also indicated that several days before the shooting she had given Kettler and Williams a ride and Kettler had left a box of 9 mm ammunition in the glove box. Law enforcement officers testified they found the ammunition as described by Stewart; a few bullets were missing from the box and the ammunition matched the type and brand of the fired bullets recovered from Dyer's body and Shaw's house.

After weighing all the evidence, the jury convicted Williams of premeditated first-degree murder, conspiracy to commit first-degree murder, and criminal possession of a firearm. Williams filed a timely appeal, over which this court has jurisdiction under K.S.A. 22-3601(b)(1) (off-grid crime; maximum sentence of life imprisonment imposed).

## SUFFICIENCY OF THE EVIDENCE

Williams raises three appellate arguments based on the underlying contention that there was insufficient evidence to support his convictions: (1) With regard to premeditated first-degree murder, Williams argues there was insufficient evidence of premeditation; (2) with regard to conspiracy to commit first-degree murder, Williams argues there was insufficient evidence of an agreement between Williams and his codefendants; and (3) with regard to the State's alternative aiding and abetting theory, Williams argues there was only evidence showing a mere association on his part and no evidence establishing his participation in such a way as to facilitate the success of the venture.

The standard of review that applies when sufficiency of the evidence is challenged in a criminal case is well known. After reviewing all the evidence in a light most favorable to the prosecution, the appellate court must be convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. Lowrance*, 298 Kan. 274, 296, 312 P.3d 328 (2013).

## A. *Premeditated First-Degree Murder*

We first apply this standard to Williams' argument that his conviction for premeditated first-degree murder must be reversed because there was insufficient evidence of premeditation.

In doing so, it must be remembered that premeditation means to have thought the matter over beforehand and does not necessarily mean an act is planned, contrived, or schemed beforehand; rather, premeditation indicates a time of reflection or deliberation. *State v. Qualls*, 297 Kan. 61, Syl. ¶ 2, 298 P.3d 311 (2013); *State v. Holmes*, 278 Kan. 603, 632, 102 P.3d 406 (2004); see PIK Crim. 3d 56.04(b). Further, it is not necessary that there be direct evidence of either intent or premeditation. Instead, premeditation, deliberation, and intent may be inferred from the established circumstances of a case, provided the inferences are reasonable. *State v. Scaife*, 286 Kan. 614, 617, 186 P.3d 755 (2008). In other words, "[i]ntent . . . may be shown by circumstantial evidence, and a person is presumed to intend all the natural consequences of his acts. [Citation omitted.]" *State v. Childers*, 222 Kan. 32, 37, 563 P.2d 999 (1977).

In considering circumstantial evidence, Kansas caselaw identifies factors to consider in determining whether the evidence gives rise to an inference of premeditation that include: "(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. [Citation omitted.]" *Scaife*, 286 Kan. at 617-18; see *State v. Marks*, 297 Kan. 131, 140, 298 P.3d 1102 (2013). But the analysis

of what inferences can be reasonably drawn is not driven by the number of factors present in a particular case because in some cases one factor alone may be compelling evidence of premeditation. See *State v. Cook*, 286 Kan. 1098, 1102, 191 P.3d 294 (2008); *State v. Morton*, 277 Kan. 575, 582-83, 86 P.3d 535 (2004) (evidence to support second and third factors sufficient in finding premeditation). Use of a deadly weapon by itself, however, is insufficient to establish premeditation. *State v. Cosby*, 293 Kan. 121, 134, 262 P.3d 285 (2011).

*Evidence Was Sufficient*

A review of the record shows evidence—both direct and circumstantial—of premeditation. Certainly the strongest evidence of premeditation came from Armstrong's sworn statement, which establishes an agreement between Williams, Kettler, Armstrong, and, later, Phillips to kill Dyer in retribution for his robbing Williams at gunpoint. But there was other evidence of premeditation as well.

Focusing on the first factor traditionally considered as evidence of premeditation—the nature of the murder weapon—Johnson testified the men entered the house with guns. Armstrong stated a gun had been hidden in Williams' car, removed from its hiding place before the men got to the liquor store, and then taken with them—specifically, by Phillips—into Shaw's house. Even in Phillips' version of events, he assumed the murder weapon had been brought into the house by Armstrong. Moreover, during the struggle over the gun, there was evidence that Kettler went to Shaw's kitchen to retrieve a knife—an alternative, but deadly weapon.

As for the second factor regarding lack of provocation, there was no evidence that Dyer did anything on the day of his death to entice Williams, Kettler, Phillips, and Armstrong to enter the house. Under any version of events other than Armstrong's testimony at his own trial, the aggressors were Armstrong, Kettler, or/or Phillips, either individually or together, and Williams aided and abetted their efforts.

Patton provided evidence of the third and fourth factors—the defendants' prior conduct and prior threats and declarations of the defendants before and/or during the occurrence. Patton testified

that Williams had issued a challenge to him and Dyer. Then, on entering Shaw's house, Phillips got in Johnson's face "talkin' about, 'Bitch, where is he?' " Johnson apparently viewed this as a threat because she pretended not to know who Phillips was referring to because she "didn't want [Phillips] to do nothing to [Dyer]."

Finally, the fifth factor—the dealing of lethal blows after the deceased was felled and rendered helpless—also weighs toward a finding of premeditation. In Armstrong's sworn statement, he indicated he had repeatedly hit Dyer in the head with a glass ashtray, causing Dyer to fall, and then Phillips fired several shots into Dyer as he was lying on the bedroom floor. Armstrong stated that Phillips was "shooting to kill." Forensic evidence confirmed that shots were fired into the floor.

Williams ignores these factors and the circumstantial and direct evidence against him. Instead, he points to evidence supporting his defense theory—that Dyer was accidentally killed and Williams had no knowledge of what was happening in the house while he waited in the car. In addition, he focuses his argument on the circumstances of Armstrong's statement, noting Armstrong had provided varied accounts of what happened on the date of the incident, had recanted his accusatory statements against Williams and the others, and had displayed uncooperative and belligerent behavior during his trial testimony.

To reach the result Williams requests, this court would have to make its own determination of credibility and reweigh the evidence, but these are not tasks an appellate court performs when conducting a sufficiency review. Instead, an appellate court considers all evidence—even if there is conflicting evidence or reasons to question its credibility—and does so in the light most favorable to the State. See *State v. Raskie*, 293 Kan. 906, 919-20, 269 P.3d 1268 (2012). Factfinders—in this case the jurors, not appellate judges—make credibility determinations. Thus, Armstrong's incriminating and accusatory statements are part of our consideration.

Further, the more incriminating versions of events relayed by Armstrong are consistent with other direct and circumstantial evidence, including the testimony of Patton, Johnson, and Mun; the

observations of several of Shaw's neighbors; and much of the evidence gathered in the investigation, including videos from cameras at the liquor store, phone records, and the nature and location of Dyer's wounds. See *Scaife*, 286 Kan. 614, Syl. ¶ 3 ("[A] factfinder is permitted to reasonably infer the existence of a material fact from circumstantial evidence, even though the evidence does not exclude every other reasonable conclusion or inference."). During the State's closing argument, the prosecutor spent considerable time detailing the discrepancies between the physical evidence and the defendants' testimony of how the fight played out.

Thus, the evidence from Armstrong's sworn statement is not so incredible that it must be disregarded. See *State v. Brinklow*, 288 Kan. 39, 53-54, 200 P.3d 1225 (2009) (identifying *State v. Matlock*, 233 Kan. 1, 4, 660 P.2d 945 [1983], as "perhaps the only case of its kind in this state where the Supreme Court directly weighed the evidence and assessed the credibility of the prosecutrix," calling *Matlock* "aberrant," and concluding in the case before it that the "inconsistencies in the evidence did not render [the victim's] testimony . . . so incredible or improbable as to defy belief"); accord *State v. Plunkett*, 261 Kan. 1024, 1033, 934 P.2d 113 (1997).

In summary, various versions of events were presented to the jury through an assortment of witnesses and other evidence. In this mix of testimony, there was sufficient evidence when viewed in the light most favorable to the State that a rational factfinder could have found beyond a reasonable doubt that Williams and the others premeditated the killing of Dyer.

## B. *Conspiracy to Commit First-Degree Murder*

Williams next contends that the State provided insufficient evidence that he entered into an agreement to commit a murder to support the conspiracy charge. An agreement is an element of conspiracy, and the jury was instructed that it had to find that Williams agreed with others to commit the crime of premeditated first-degree murder. See PIK Crim. 3d 55.03 (conspiracy).

In order to meet the sufficiency of the evidence standard, there must be evidence supporting each element of a crime, such as the agreement element of the conspiracy charge. See K.S.A. 21-

3302(a); *State v. Northcutt*, 290 Kan. 224, 231, 224 P.3d 564 (2010); *State v. Webber*, 260 Kan. 263, 288, 918 P.2d 609 (1996), *cert. denied* 519 U.S. 1090 (1997). The existence of an agreement does not need to be proved directly, however. "[I]t is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances. [Citation omitted.]" *State v. Swafford*, 257 Kan. 1023, 1040, 897 P.2d 1027 (1995); see *State v. Sharp*, 289 Kan. 72, 104-05, 210 P.3d 590 (2009); *State v. Davis*, 284 Kan. 728, 737-38, 163 P.3d 1224 (2007).

Applying these principles, we conclude the record includes evidence of an agreement between Williams, Kettler, Phillips, and Armstrong to shoot and kill Dyer. Armstrong had stated that he had several discussions with Kettler and Williams "about getting" Dyer. It was agreed that "if you see [Dyer], shoot him." Armstrong also stated that although nobody explicitly said, "[W]e got to go kill" Dyer, "[W]e all knew what the goal was when we went over there . . . to kill James Dyer." Additionally, he said that Phillips joined in this agreement. The jury could have inferred that the foursome had an agreement to kill Dyer through Armstrong's statements, the fact Phillips alerted the others to Dyer's whereabouts, and the speed with which they acted once Phillips spotted Dyer.

Once again, Williams attacks the credibility of Armstrong's incriminating and accusatory statements because of Armstrong's various versions of events and because Armstrong later recanted his sworn statement. It was the jury, however, that had the duty to weigh the evidence and determine the credibility of the witnesses. The jury was not bound to accept any one witness' version of the facts; and having convicted Williams, the jury is presumed to have believed the State's evidence and to have drawn from it all reasonable inferences favorable to the State. See *State v. Aikens*, 261 Kan. 346, 392, 932 P.2d 408 (1997), *rev'd on other grounds by State v. Warrior*, 294 Kan. 484, 277 P.3d 1111 (2012); see also *State v. Moody*, 223 Kan. 699, 704-05, 576 P.2d 637 (evidence, which stood or fell on whether jury believed coconspirator who was primary witness against defendant, was sufficient to support defendant's conviction of conspiracy to commit aggravated burglary and aggra-

vated robbery), *cert. denied* 439 U.S. 894 (1978). Further, this court does not reevaluate credibility a jury has already determined. See *State v. Peppers*, 294 Kan. 377, 401, 276 P.3d 148 (2012); *Raskie*, 293 Kan. at 920; *State v. Ward*, 292 Kan. 541, Syl. ¶ 12, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Williams further suggests that it is unclear from Armstrong's statements which of the four—Armstrong, Williams, Kettler, and Phillips—were going to find Dyer and kill him. While it is true there is no evidence of a plan for a specific person to kill Dyer, there was evidence that all four friends agreed whichever one of them had the opportunity would kill Dyer. See *Qualls*, 297 Kan. 61, Syl. ¶ 2 ("Premeditation does not necessarily mean an act is planned, contrived, or schemed beforehand; rather, premeditation indicates a time of reflection or deliberation."). Armstrong was asked if the initial plan to shoot Dyer "would apply to any of the three of you," referring to Armstrong, Williams, and Kettler. Armstrong confirmed that the plan applied to "[a]ny of us." Then, after discussing the fact that Phillips had been in jail and was released just before Dyer's death, the prosecutor asked how Phillips got involved in the plan to shoot Dyer. Armstrong stated that Kettler and Phillips had previously talked on the phone and Kettler had explained the situation "in code."

From this evidence, in a light most favorable to the prosecution, a rational jury could infer beyond a reasonable doubt that an agreement existed between Williams, Kettler, Phillips, and Armstrong to kill Dyer. The evidence was sufficient to establish the agreement element of conspiracy.

## C. *Aiding and Abetting Versus Mere Association*

In another sufficiency argument, Williams argues that the State failed to present sufficient evidence to support its aiding and abetting theory. Instead, Williams contends that the evidence demonstrates his mere presence and association with the other participants in the crime of premeditated first-degree murder. Specifically, Williams asserts: "The weight of evidence shows Williams waited in the car while others went inside. There was no

evidence that Williams encouraged anyone to kill Dyer, or that he helped plan it."

As Williams points out, "[w]ithout other incriminating evidence, mere presence in the vicinity of the crime or mere association with the principals that committed the crime is not sufficient to establish guilt as an aider or abettor. [Citation omitted.]" *State v. Green*, 280 Kan. 758, 761-62, 127 P.3d 241, *cert. denied* 549 U.S. 913 (2006). Instead, to establish guilt on the basis of aiding and abetting, the State is required to show that a defendant knowingly associated with the unlawful venture and participated in such a way as to indicate that he or she was facilitating the venture's success. The element of intent necessary to obtain a conviction for aiding and abetting may be inferred from circumstantial evidence. *State v. Gant*, 288 Kan. 76, 83, 201 P.3d 673 (2009), *overruled on other grounds by State v. Sampson*, 297 Kan. 288, 301 P.3d 276 (2013); *State v. Herron*, 286 Kan. 959, 967, 189 P.3d 1173 (2008); *State v. Goering*, 225 Kan. 755, Syl. ¶ 2, 594 P.2d 194 (1979).

Williams focuses on the intent requirement of premeditated first-degree murder. But, as we have already discussed, there was ample evidence that Williams premeditated the murder of Dyer and that he conspired with Kettler, Phillips, and Armstrong. The evidence was that the murder was motivated by a desire to avenge Dyer's robbery of Williams. Further, there was evidence that it was Williams who brought the murder weapon to Shaw's house and that it was Williams who asked Stewart to hide the gun.

Although Williams attempts to cast himself as the innocent driver, there was evidence he knew what the others were going to do upon entering Shaw's house and, under those circumstances, Williams' participation in the planning, transporting the others to and from the crime scene, and providing a gun was evidence of aiding and abetting the murder. See *State v. Llamas*, 298 Kan. 246, 254-58, 311 P.3d 399 (2013) (evidence sufficient to establish aiding and abetting theory where defendant purposefully moved from the passenger's side of the vehicle where he had been riding to the driver's side so that he could drive shooter away from the scene of the crime); *Gant*, 288 Kan. at 84 (driving a vehicle with intent to transport others to or from crime scene sufficient to support con-

viction for aiding and abetting crime); *State v. Huff*, 235 Kan. 637, 640-41, 681 P.2d 656 (1984) (same); *Goering*, 225 Kan. at 758 (same).

This evidence was sufficient for a rational juror to find beyond a reasonable doubt that Williams helped facilitate the murder and did so after having formed the intent that their actions would result in the murder of Dyer—that is, after premeditating the murder.

### AIDING AND ABETTING NEED NOT BE ALLEGED

Williams raises two additional issues regarding the State's aiding and abetting theory as it pertains to the crime of premeditated first-degree murder. The first of these issues involves subject matter jurisdiction and the State's failure to charge aiding and abetting in the criminal complaint. For the first time on appeal, Williams contends that the State's failure to specifically charge him with aiding and abetting as a separate crime rendered the charging document insufficient to confer subject matter jurisdiction upon the trial court. However, as correctly pointed out by the State, Kansas precedent does not require the State to charge a defendant with aiding and abetting a crime.

Williams acknowledges that he raises this jurisdictional question for the first time on appeal; however, subject matter jurisdiction can be raised at any time. See *State v. Trotter*, 296 Kan. 898, 905, 295 P.3d 1039 (2013); *State v. Sales*, 290 Kan. 130, 135, 224 P.3d 546 (2010); see also *In re Marriage of Hampshire*, 261 Kan. 854, 862, 934 P.2d 58 (1997) (judgment rendered without subject matter jurisdiction is void; void judgment is nullity that may be vacated at any time). Thus, we can consider whether the complaint conferred subject matter jurisdiction. This presents a question of law over which we have unlimited review. *State v. Gonzales*, 289 Kan. 351, 366, 212 P.3d 215 (2009).

Williams notes that, under K.S.A. 22-3201(b), a complaint "shall be a plain and concise written statement of the essential facts constituting the crime charged, which . . . drawn in the language of the statute, shall be deemed sufficient." Because "all crimes are statutory, and the elements necessary to constitute a crime must be gathered wholly from the statute[, a complaint] which omits one

or more of the essential elements of the crimes it attempts to charge is jurisdictionally and fatally defective." *State v. Sanford,* 250 Kan. 592, 601, 830 P.2d 14 (1992). Building on these principles, Williams argues that "aiding and abetting is a separate crime and has different elements of proof required than that of a person committing a crime as a principal."

The problem with Williams' argument is that this court has stated that "aiding and abetting is not a separate crime in Kansas. Instead, it extends criminal liability to a person other than the principal actor." *State v. Robinson,* 293 Kan. 1002, 1038, 270 P.3d 1183 (2012) (citing *State v. Spangler,* 38 Kan. App. 2d 817, 830, 173 P.3d 656 [2007]); see K.S.A. 21-3205 (liability for crimes of another); *State v. Turner,* 193 Kan. 189, 196, 392 P.2d 863 (1964) ("All participants in a crime are equally guilty, without regard to the extent of their participation."). Accordingly, this court has consistently held that the State is not required to charge aiding and abetting in the charging document in order to pursue a theory of accomplice liability at trial. See, *e.g., State v. Amos,* 271 Kan. 565, Syl. ¶ 2, 23 P.3d 883 (2001); *State v. Pennington,* 254 Kan. 757, Syl. ¶ 4, 869 P.2d 624 (1994); *State v. Smolin,* 221 Kan. 149, 152, 557 P.2d 1241 (1976).

At oral argument, Williams' counsel suggested that this caselaw must be reconsidered in light of language in the current version of the aiding and abetting statute. We need not reach the merits of this argument, however, because the current statute was not effective until July 1, 2011, almost 4 years after Dyer's death and the filing of a complaint against Williams and approximately 2 years after the trial in this case. Thus, the trial court had exercised its jurisdiction before the provisions on which Williams relies were enacted. See K.S.A. 2013 Supp. 21-5210; L. 2010, ch. 136, sec. 30.

Consequently, the criminal complaint against Williams was not jurisdictionally defective for failing to charge aiding and abetting.

## AIDING AND ABETTING IS NOT AN ALTERNATIVE MEANS

Williams also contends that his conviction for premeditated first-degree murder must be reversed because the State presented two alternative means of committing the crime—as the principal actor

or as an aider and abettor under K.S.A. 21-3205(1)—but the State failed to present sufficient evidence that Williams participated as the principal. See *State v. Wright*, 290 Kan. 194, 201, 224 P.3d 1159 (2010) (in an alternative means case the State must present sufficient evidence to permit a jury to find each means of committing the crime beyond a reasonable doubt in order to assure jury unanimity), *overruled on other grounds by State v. Nunez*, 298 Kan. 661, 316 P.3d 717 (2014); *State v. Timley*, 255 Kan. 286, Syl. ¶ 1, 875 P.2d 242 (1994) (same). The first question for consideration is whether we are even presented with an alternative means issue, a question that presents an issue of law. See *State v. Brown*, 295 Kan. 181, 193-94, 284 P.3d 977 (2012).

In *Brown*, we held that alternative means are legislatively determined distinct, material elements of a crime, as opposed to legislative descriptions of material elements or factual circumstances that would prove the crime. We explained:

"The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. But merely describing a material element or a factual circumstance that would prove the crime does not create alternative means, even if the description is included in a jury instruction. [Citations omitted.]" 295 Kan. at 194.

Recently, in *State v. Betancourt*, 299 Kan. 131, Syl. ¶ 1, 322 P.3d 353 (2014), we applied these principles and held that "the Kansas aiding and abetting statute does not create distinct material elements of a crime but simply assigns criminal responsibility. The statute describes factual circumstances that may be proved in order to obtain a conviction for other crimes." Hence, the statute does not create an alternative means of committing the underlying crime, and the State is not required to prove that the defendant was both a principal and an accessory or to elect between the theory that the defendant was an aider and abettor or the theory that the defendant was the principal actor in the commission of the crime.

Under the holding in *Betancourt*, Williams' alternative means argument has no merit.

## Batson Challenges

Next, Williams contends that the State's exercise of peremptory challenges to strike three African-Americans from the jury panel violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as analyzed in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). He focuses on prospective jurors L.S., R.N., and R.H. and notes that at the end of the jury selection process no African-Americans remained on the jury. Williams takes issue with this because he and his codefendants are African-Americans and some of their friends or acquaintances who testified are African-Americans as well. Williams contends that the State's proffered reasons for striking L.S., R.N., and R.H. were pretextual, demonstrating purposeful discrimination, which entitles him to a new trial.

### Standards of Review

In *Batson*, the United States Supreme Court held that the Equal Protection Clause applies to the State's privilege to strike prospective jurors through peremptory challenges. When a *Batson* challenge is asserted, a three-step analysis applies; each step is governed by its own standard of review. *State v. Hill*, 290 Kan. 339, 358, 228 P.3d 1027 (2010); *State v. Pham*, 281 Kan. 1227, 1237, 136 P.3d 919 (2006).

First, the party challenging the strike must make a prima facie showing that the other party exercised a peremptory challenge on the basis of race. Appellate courts utilize plenary or unlimited review over this step. *Hill*, 290 Kan. at 358.

Second, if a prima facie case is established, the burden shifts to the party exercising the strike to articulate a race-neutral reason for striking the prospective juror. This reason must be facially valid, but it does not need to be persuasive or plausible. The reason offered will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The opponent of the strike continues to bear the burden of persuasion. 290 Kan. at 358.

Third, the trial court must determine whether the objecting party has carried the burden of proving purposeful discrimination. This step hinges on credibility determinations. "[U]sually there is

limited evidence on the issue, and the best evidence is often the demeanor of the party exercising the challenge. As such, it falls within the trial court's province to decide, and that decision is reviewed under an abuse of discretion standard. [Citations omitted.]" *State v. McCullough*, 293 Kan. 970, 992, 270 P.3d 1142 (2012).

*Striking of Prospective Jurors and the Trial Court's Rulings*

During the jury selection process, Williams raised a *Batson* challenge to the State's decision to strike R.N. and L.S. Williams' codefendant Phillips challenged the State's decision to strike R.H., and Williams joined in this *Batson* challenge. The parties do not dispute that Williams established a prima facie case that these prospective jurors were struck based on race.

After Williams challenged those strikes, the trial court gave the State the opportunity to respond. As for prospective juror R.N., the race-neutral reason provided by the State was that R.N. indicated on his jury questionnaire that he had unpaid traffic tickets pending; thus, the State argued that R.N. "had some adverse contact with law enforcement." The State further noted that the prosecution was trying to eliminate younger individuals lacking in "life experience and/or combination of formal education," and R.N. fit this description. Williams' defense counsel responded that Williams "is a young black man and is not educated" and the existence of "unpaid traffic tickets . . . does not necessarily imply any significant law enforcement contact, [it] implies more inability to pay."

After listening to all the arguments, the judge denied the *Batson* challenge regarding R.N., concluding, "I don't believe that the defendant has made or met his burden to show purposeful discrimination based on the fact . . . the State is contending."

As to L.S., the State explained it was striking L.S. because she was employed as a kitchen supervisor at a correctional facility during the time that one of the witnesses for the prosecution, Stewart, was incarcerated at that facility. The State opined it was possible that L.S. had contact with Stewart and other witnesses and would recognize them when they testified, even though L.S. had not recognized their names.

Williams' defense counsel responded to the State's explanation by arguing that other potential jurors (presumably non-African-Americans) remained on the jury panel despite having had "law enforcement contact with corrections' personnel." But the State then pointed out that L.S. was the *only* potential juror who worked at this particular correctional facility at the same time that a witness in the case was incarcerated there. The trial court found that the defendant failed to carry the burden of proving purposeful discrimination.

Finally, with respect to prospective juror R.H., the State's proffered race-neutral reasons for the strike were that she "appeared to not be listening, not paying attention," and possibly had difficulty processing a lot of information. The State further noted that R.H. failed to respond to some questions during voir dire or only responded after counsel or the trial court repeated questions several times. The prosecutor expanded on the explanation by pointing out that "there were multiple times when [R.H.'s] eyes were closed" and "her hands were resting on her head." At one point, even Williams' defense counsel noted that R.H. appeared to be asleep.

The defense attorneys in this case were not entirely in accord with regard to R.H. Phillips' defense counsel accused the State of sending the message that "all the blacks out here aren't smart enough, they're stupid, they can't comprehend, they're not quick enough." Williams' defense counsel agreed that it was wrong to strike R.H., noting that one time when R.H. appeared to be sleeping she immediately told counsel that she was not sleepy. Kettler's defense counsel, however, agreed with the State's decision to strike R.H., stating that R.H. demonstrated a "complete lack of ability to function," demonstrated "either a complete lack of interest or inability to or unwillingness to pay attention," and displayed a possible "lack of intellectual functioning that we need for this jury." The trial court concluded that the State's motivation for striking R.H. was not discriminatory.

Summarizing the rulings regarding all of the challenges, the trial court found "there were race-neutral reasons that those individuals were struck and there was no purposeful discrimination against any of those individuals."

*State Proffered Nondiscriminatory Rulings for Strikes*

In attacking the trial court's ruling on appeal, Williams argues that the decision to strike L.S. and R.N. shows purposeful discrimination because these potential jurors exhibited "similar characteristics" to some non-African-American individuals who ultimately served on the jury. This court has stated that the State's failure to strike a nonminority juror with similar characteristics as a stricken prospective minority juror is circumstantial, although not conclusive, evidence of purposeful discrimination. *State v. Trotter*, 280 Kan. 800, 818, 127 P.3d 972 (2006). Conversely, evidence that the State struck minority and nonminority panel members for the same reason can be evidence that a defendant has failed to carry his or her burden of demonstrating purposeful discrimination. See *Miller-El v. Dretke*, 545 U.S. 231, 241, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005); *State v. Angelo*, 287 Kan. 262, 274, 197 P.3d 337 (2008).

Consistent with these authorities, the State pointed out to the trial court that it had struck nonminority panel members for the same reasons it struck R.N.—youthfulness, lack of experience, and potentially negative experiences with law enforcement. In response to this statement, Williams' counsel acknowledged that the defendants had also exercised peremptory challenges to strike other youthful prospective jurors. This concession was sufficient to establish youthfulness and lack of experience as a nondiscriminatory reason for the strike—a reason used by both the State and the defense—even if it could be disputed that R.N. had negative experiences with law enforcement. The additional reason of the traffic tickets does not negate the other nondiscriminatory reasons offered by the State.

Further, even though Williams contended before the trial court and now on appeal that there were venire members who had similar characteristics that remained on the jury, Williams' counsel did not make a record adequate for us to rule in Williams' favor; he did not identify those jurors he felt had similar characteristics. Hence, from the trial record itself, we are unable to analyze Williams' argument.

Similarly, on appeal, Williams does not direct this court to any pages in the record supporting his "similar characteristics" assertion. See *McCullough*, 293 Kan. at 999 (appellant's burden to designate a record affirmatively showing error). Appellate courts "will not independently search the record and guess which specific facts [appellant] believes support his general allegations." *State v. Bryant*, 285 Kan. 970, 977, 179 P.3d 1122 (2008); see Rule 6.02(a)(4) (2013 Kan. Ct. R. Annot. 39) ("The court may presume that a factual statement made without a reference to volume and page number has no support in the record on appeal."). Because we are unable to determine if there is factual support for Williams' position, his arguments regarding the State's decision to strike R.N. fails.

As to the reason given by the State for striking L.S.—that she might know one of the State's witnesses—other courts have recognized that this is a nondiscriminatory reason for exercising a peremptory strike. See, *e.g.*, *United States v. McKay*, 431 F.3d 1085, 1092 (8th Cir. 2005), *cert. denied* 547 U.S. 1174 (2006). We agree; in fact, potential knowledge of a witness is a frequent reason for striking prospective jurors.

As for R.H., in looking for purposeful discrimination, the court can consider a potential juror's body language. See *State v. Dean*, 273 Kan. 929, 932-33, 46 P.3d 1130 (2002); *State v. Hood*, 245 Kan. 367, 374-75, 780 P.2d 160 (1989). Here, the State proffered that factor as an explanation for striking R.H.—this potential juror was inattentive, failed to stand when introducing herself to the trial court, and appeared to be asleep at times. The State presented facially valid race-neutral reasons for striking R.H.

In summary, although the elimination of all African-American's from the jury is very troubling, we note that Kettler's defense counsel recognized that the defense had struck two other minority prospective jurors from the venire panel. This means that Williams has not established that the State purposefully sought to eliminate *all* minority members of the panel; we simply do not know whether the State would have exercised peremptory challenges to remove the two minority prospective jurors who were removed by the defense. Further, based on the race-neutral reasons articulated by

the State for its strikes, we conclude that the trial court did not abuse its discretion in concluding that Williams failed in his ultimate burden to prove purposeful discrimination during the jury selection process.

## PROSECUTORIAL MISCONDUCT

Williams raises two prosecutorial misconduct claims alleging misconduct during closing argument. The first claim involves the prosecutor's comments on the gun evidence presented at trial and the prosecutor's corresponding reference to "street justice," and the second claim involves the prosecutor's comments on the meaning of the term "premeditated." As will be discussed below, the first comment on guns and street justice was not improper; and while the second comment is a misstatement of the law, we are convinced beyond a reasonable doubt that the error did not affect Williams' substantial rights.

*Standard of Review*

To determine whether a prosecutor committed reversible misconduct, we first decide if the challenged comment exceeded the wide latitude of language and manner afforded the prosecutor when discussing the evidence. If the comment was outside these bounds, we next decide if the comment constitutes reversible error, which requires a finding that the comment was so prejudicial as to deny the defendant a fair trial. *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013); *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 (2004).

In analyzing the second step of whether the defendant was denied a fair trial, we consider three factors: "(1) whether the misconduct was gross and flagrant; (2) whether it was motivated by prosecutorial ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors." No one factor is controlling. *Bridges*, 297 Kan. at 1012; *Tosh*, 278 Kan. at 93.

Before the third factor can ever override the first two factors, an appellate court must be able to say that the State can meet the harmlessness tests of both K.S.A. 60-261 and *Chapman v. Califor-*

*nia*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). *Bridges*, 297 Kan. at 1012 (citing *Tosh*, 278 Kan. at 97). In *Chapman*, the United States Supreme Court directed that a constitutional error can be deemed harmless only if "the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). If the error does not violate the United States Constitution, the harmless error analysis is defined in K.S.A. 60-261, and the test is whether "there is a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record." 292 Kan. 541, Syl. ¶ 6.

Even though we have applied this dual harmless error standard, we also have observed that as a practical matter the result of the harmless error evaluation depends on the outcome of the constitutional standard. "[B]oth the constitutional and nonconstitutional error clearly arise from the very same acts and omissions," and the constitutional standard is more rigorous. Thus, the State necessarily meets the lower statutory standard under K.S.A. 60-261 if it meets the higher constitutional standard. See *Bridges*, 297 Kan. at 1015 (citing *State v. Herbel*, 296 Kan. 1101, 1111, 299 P.3d 292 [2013]).

We next apply that standard to the instances of claimed misconduct.

## A. *Guns and Street Justice*

Williams first argues that the prosecutor argued facts not in evidence and tried to appeal to the jury's sense of community. He challenges the following italicized statement made by the prosecutor during closing argument, where the prosecutor was discussing Mun's testimony and suggesting reasons why various witnesses provided different versions of what happened on the night of the incident:

"For whatever reason, maybe [Mun] didn't think [the defendants] were going to murder [Dyer]. Maybe [Mun] was scared and wanted to stay out of the way. They weren't after [Mun]. They were after [Dyer]. There's no reason for [Mun] to be

inserted into this situation. What [Dyer] gets, [Dyer] gets, he brought on himself. I [Mun] didn't do any of this. I want none of it, I'm staying out of harm's way. Not the most heroic position one could take [but] you could certainly understand why [Mun] would take it. *These guys got guns.* This is the street. Things are different out there than they may be in the courtroom. . . . . . I [prosecutor] think [the] Detective . . . talked about *street justice.* They know what's about to go down. It's about self-preservation. I think that's what [Mun] did. He tried to save his own neck. You can't blame the guy. But if you have any problems with [Mun], that's what it is, because you think he knew what was about to go down before it went down." (Emphasis added.)

Williams argues that the statement, "These guys got guns," was a misstatement of the evidence because there was only one gun amongst the four perpetrators and the evidence did not even place Williams with a gun inside Shaw's house. Further, Williams contends that in context, the statement erroneously appealed to the jury's sense of community by implying that the jury should prevent "street justice."

A fundamental rule regarding closing argument requires prosecutors to confine their comments to matters in evidence and to not misstate the facts. See *State v. Tahah*, 293 Kan. 267, 277, 262 P.3d 1045 (2011); *State v. McCaslin*, 291 Kan. 697, Syl. ¶ 14, 245 P.3d 1030 (2011); *State v. Richmond*, 289 Kan. 419, 440-41, 212 P.3d 165 (2009) (quoting *State v. Baker*, 281 Kan. 997, Syl. ¶ 11, 135 P.3d 1098 [2006]). In addition, a prosecutor should not make statements intended to inflame the prejudices of the jury or to divert the jury's attention from its duty to decide the case based on the evidence and the controlling law. *Tosh*, 278 Kan. at 90. Nevertheless, a prosecutor is allowed considerable latitude in discussing the evidence and drawing reasonable inferences from that evidence. *Richmond*, 289 Kan. at 441; see *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009).

The State argues that it was not a misstatement of the evidence for the prosecutor to say, "These guys got guns." We agree. Evidence that there was more than one gun was introduced through the testimony of Johnson. She testified to seeing Kettler, Phillips, and Armstrong enter Shaw's house and "they had guns." When asked if she was referring to all three men, Johnson said, "Yes." As such, although there was conflicting evidence about the number

of guns, the State did present evidence that there were multiple guns possessed by multiple perpetrators. Furthermore, although there was no evidence that Williams had a gun once inside the house, there was evidence that Williams had stored a gun behind the CD player in his dash, that this gun was a 9 mm weapon like the murder weapon, and that Williams took steps to have the gun hidden after the shooting. Hence, the prosecutor's statement, "These guys got guns," was consistent with evidence introduced at trial—that all four defendants had possession of a gun at some point in time—and was directed to a point of evidentiary contention. The statement did not fall outside the wide latitude of proper comment.

Williams' other argument—that the prosecutor's gun statement referenced "street justice" and improperly appealed to the jury's sense of protecting the community—is not a fair description of what the prosecutor conveyed during closing argument. The prosecutor was not asking the jury to exercise street justice, telling the jury it needed to convict Williams in order to protect the community or otherwise appealing to the juror's emotions. Instead, the prosecutor's mention of guns and street justice was made in the context of describing the evidence, explaining the motive for murder, and explaining Mun's testimony. In essence, "street justice" was another way of explaining that the attack on Dyer was made in retaliation for the armed robbery of Williams, and it was a phrase that had been used by a detective in his testimony. Hence, the use of the phrase reminded the jury of a witness' testimony, explained evidence, and was linked to evidence in the record.

Considering the evidence, along with the "considerable latitude [allowed a prosecutor] in discussing the evidence and drawing reasonable inferences from that evidence," the comments were not improper. See *McCaslin*, 291 Kan. 697, Syl. ¶ 14.

### B. *Misstatements Regarding Premeditation*

Next, in an argument that is identical to arguments made by Kettler and Phillips, Williams argues the prosecutor committed misconduct during closing argument by misstating the legal definition of "premeditation." A misstatement of the law during a pros-

ecutor's closing argument can deny a defendant a fair trial when "the facts are such that the jury could have been confused or misled by the statement." *State v. Phillips*, 295 Kan. 929, Syl. ¶ 5, 287 P.3d 245 (2012).

### Alleged Misconduct

Here, the alleged prosecutorial misconduct occurred when the prosecutor was describing the elements of premeditated first-degree murder and stated:

"There are basically three elements to that offense that the State needs to prove to you. First, that the killing of James Dyer, Jr. was done intentionally, that means purposeful[ly], willfully, but not by accident. And we'll get into each one of these and how the evidence applies to these, but I guess in summary, James Dyer did not die by accident. He was intentionally murdered by these individuals. The second . . . is that it was done with premeditation. *What that means is . . . that they thought it over before they went in and did it. That's what premeditation is. There's even an instruction about what does that mean, thought it over, you could think it over, just a half second before you actually fired the fatal shot, that's true,* but that's for you to decide whether or not they thought it over before they actually committed the act.

"Again, I would suggest that the evidence does support the fact that these three, along with Mr. Armstrong, clearly thought over what they were about to do before they went to Rhonda Shaw's house. This was no happenstance. This was no accident. This is something these four individuals thought about as they made their way over to Rhonda Shaw's house. It's the reason they went there, was to get James Dyer." (Emphasis added.)

### Misstatement of Law

Williams contends that the prosecutor's "half second" description of premeditation is analogous to stating premeditation can be instantaneous—language this court disapproved in *State v. Holmes*, 272 Kan. 491, 33 P.3d 856 (2001). Williams makes a persuasive point.

In *Holmes*, the victim was shot and killed in a struggle over a gun. The defendant was convicted of premeditated first-degree murder, although there was no evidence of premeditation before the struggle began. During closing argument, the prosecutor stated that " 'premeditation can occur in an instant. That's the law in the State of Kansas.' " 272 Kan. at 497. Then, in rebuttal the prosecutor stated that " 'premeditation can take a second. . . . It can happen

in a second.' " 272 Kan. at 497. This court determined that the prosecutor's statements constituted a deliberate misstatement of the law, noting the prosecutor had been cautioned in the jury instructions conference before argument began to avoid such comments. Cumulatively, the lack of evidence of premeditation before the struggle began and the deliberate nature of the comments convinced this court that the prosecutor's misconduct created reversible error. 272 Kan. at 499-500.

Consistent with *Holmes*, this court has repeatedly warned prosecutors about going outside of the approved language in PIK Crim. 3d 56.04(b) and making comments that are analogous to stating premeditation can occur in the same instant as the act that results in a death. See, *e.g.*, *State v. Hall*, 292 Kan. 841, 850-52, 257 P.3d 272 (2011) (prosecutor's statement during closing argument that defendant could have formed premeditation after the pull of the first trigger, "because remember, he pulls four times," improperly stated the law and essentially suggested that premeditation could have been formed instantaneously); *State v. Cosby*, 285 Kan. 230, 248, 169 P.3d 1128 (2007) ("We have consistently found reversible misconduct when a prosecutor states or implies that premeditation can be instantaneous."); *State v. Morton*, 277 Kan. 575, 585, 86 P.3d 535 (2004) (reversible error for prosecutor to imply premeditation can be instantaneous, based on closing argument that " '[o]ne squeeze of a trigger is all it takes' "); *State v. Pabst*, 273 Kan. 658, 662, 44 P.3d 1230 ("A discussion of PIK Crim. 3d 56.04[b] in closing argument should avoid any temptation to use a synonym to convey the suggestion of 'an instant' without using the actual phrase."), *cert. denied* 537 U.S. 959 (2002); *State v. Moncla*, 262 Kan. 58, 70-73, 936 P.2d 727 (1997) (adding phrase " 'it may arise in an instant' " to pattern instruction on premeditation was inappropriate; use of such language tended to diminish importance of the element of premeditation).

The State suggests that while the prosecutor's "half second" reference was inartful, the prosecutor was merely trying to convey that the jury *could* find the decision to kill Dyer occurred in half a second, and it was the jury's duty to determine *if* that constituted "thinking it over beforehand." This argument is not persuasive. The

prosecutor's statement informed the jury that the "beforehand" period could be a half second. Further, the descriptive term "half second" is obviously a shorter period of time than the " 'in a second' " phrase disapproved in *Holmes* and is not significantly different than saying " 'in an instant' " or in a " 'squeeze of a trigger,' " as disapproved in several cases. As in those cases, Williams' jury could have taken the prosecutor's choice of words as suggesting that premeditation can be instantaneous with the homicidal act. As such, we conclude the prosecutor misstated the law.

### Not Reversible Error

With prosecutorial misconduct established, it is necessary to determine whether the error requires reversal under the second analytical step. As we have discussed, this requires a harmlessness inquiry using three factors. See *Bridges*, 297 Kan. at 1012.

In assessing the first factor of whether gross and flagrant conduct occurred, a misstatement of the law can be considered gross and flagrant, especially if the statement is contrary to a longstanding rule of law. See *State v. Kemble*, 291 Kan. 109, 121-25, 238 P.3d 251 (2010) (factors determining gross and flagrant conduct include repeated comments, emphasis on improper point, planned or calculated statements, violation of a well-established rule, and violation of a rule designed to protect a constitutional right); accord *State v. Brown*, 295 Kan. 181, 214, 284 P.3d 977 (2012). Given our past advice that prosecutors should be especially careful in discussing the meaning of the term "premeditation," we conclude the misconduct was gross and flagrant.

Nevertheless, we do not find evidence of ill will. A prosecutor's ill will is often " 'reflected through deliberate and repeated misconduct.' [Citation omitted.]" *State v. Inkelaar*, 293 Kan. 414, 430, 264 P.3d 81 (2011). These circumstances do not exist in this case. The misstatement was isolated and surrounded by correct statements of law. As shown in the portion of the transcript quoted above, both before and after the reference to the "half second," the prosecutor mentioned correctly that premeditation means "thought it over" beforehand. The prosecutor argued that the evidence showed that Williams and the others thought over the killing

of Dyer before they arrived at Shaw's house. Given the context of the statement, we conclude the prosecutor was not motivated by ill will.

Turning to the third factor, whether the evidence against the defendant was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of the jurors, we conclude there is no reasonable possibility the misstatement affected the verdict. The State's theory of premeditation was that Williams, Kettler, Phillips, and Armstrong went into Shaw's house with the intent to kill Dyer. In fact, immediately upon making the misstatement, the prosecutor said that Williams and the others went to Shaw's house "to get" Dyer and they thought about getting him on their way from the liquor store to the house. This theme was repeated and emphasized throughout the closing argument. As we have discussed, there was considerable evidence to support this theory, which distinguishes this case from *Holmes*, 272 Kan. at 499-500, where this court reversed a defendant's conviction because of a similar statement. Further, the State did not discuss or emphasize any version of the facts that would suggest any of the defendants premeditated the murder in an instant or a half second.

In addition, the trial court properly instructed the jury on the definition of premeditation and instructed the jury that arguments of counsel were not evidence. Specifically, the trial court gave PIK Crim. 3d 56.04(b) (premeditation) in conjunction with the instruction on first-degree murder prior to the parties' closing arguments. See *State v. Jamison*, 269 Kan. 564, 573, 7 P.3d 1204 (2000) ("Consistent with our past decisions, we conclude that the definition of 'premeditation' in PIK Crim. 3d 56.04[b] adequately conveys the concept that 'premeditation' means something more than the instantaneous, intentional act of taking another's life."). The trial court also gave PIK Crim. 3d 54.05 (responsibility for crimes of another), which informed the jury, in part, that "[a] person who, either before or during it commission, intentionally aids or abets another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed." See K.S.A. 21-3205(1) (discussed previously). Because the evidence suggested that Williams was not in the same room as Dyer

during the fight and when the shots were fired, the application of this instruction to the facts meant that the jury had to find that the premeditation occurred before Williams' conspirators began the fight.

Because we presume the jury followed the court's instructions, the court's guidance served to mitigate any potential harm caused by the prosecutor's statements. See *State v. Huddleston*, 298 Kan. 941, 956, 318 P.3d 140 (2014) ("Although these instructions do not give the prosecutor a free pass on misconduct, they are appropriate considerations when evaluating whether a jury was misled."); *State v. Hebert*, 277 Kan. 61, 85, 82 P.3d 470 (2004) (prosecutor's improper comment regarding premeditation was not reversible error when there was no evidence that prosecutor deliberately misstated the law, jury was given proper PIK instruction on premeditation, and jury was told that arguments of counsel were not evidence); *State v. Doyle*, 272 Kan. 1157, 1165-66, 38 P.3d 650 (2002) (no indication prosecutor purposefully misstated the law and evidence of premeditation was strong); *Jamison*, 269 Kan. at 572-73 (prosecutor's misstatement on the law on premeditation was not reversible error when the jury was properly instructed on the law).

In light of the jury instructions, the facts of the case, and the theme of the prosecutor's argument that the premeditation had occurred before Phillips and the others arrived at Shaw's house, we conclude the jury would not have been confused or misled by the prosecutor's misstatement. The State has demonstrated beyond a reasonable doubt that the prosecutor's misstatement did not affect the outcome of the trial and does not require reversal.

## CONFRONTATION ISSUE NOT PRESERVED

Williams takes issue with the trial court's decision to allow the jury to consider what Williams describes as Armstrong's "recorded statement to police officers" and also Armstrong's sworn statement. He contends these were hearsay statements and that the admission of these statements violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.

Williams failed to preserve this issue for appeal, however, because he did not state a Confrontation Clause objection when this

evidence was admitted. K.S.A. 60-404 provides that no verdict shall be set aside based upon the erroneous admission of evidence unless an objection was "timely interposed and so stated as to make clear the specific ground of objection." Generally, constitutional grounds for reversal are subject to this same rule, and objections raised for the first time on appeal are not properly preserved for appellate review. *State v. Raskie*, 293 Kan. 906, 919, 269 P.3d 1268 (2012); *King*, 288 Kan. at 348-49; *State v. Gaudina*, 284 Kan. 354, 372, 160 P.3d 854 (2007). This court has reiterated that "it is the defendant's responsibility to 'rais[e] his Confrontation Clause objection.'" *State v. Dukes*, 290 Kan. 485, 489, 231 P.3d 558 (2010) (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 327, 129 S. Ct. 2527, 174 L. Ed. 2d 314 [2009]).

Williams acknowledges that he failed to make an objection to the admission of Armstrong's prior statements on the basis of the Confrontation Clause, but he urges this court to apply an "ends of justice" exception to the general rule that this court will not consider an issue that is raised for the first time on appeal. See *State v. Kirtdoll*, 281 Kan. 1138, 1149, 136 P.3d 417 (2006). This court has held, however, that if an appellate court was to overlook the lack of an objection " 'because it is necessary to serve the ends of justice or to prevent the denial of [a defendant's] right to a fair trial, these and other caselaw exceptions would soon swallow the general statutory rule' of K.S.A. 60-404." *State v. Randolph*, 297 Kan. 320, 335, 301 P.3d 300 (2013) (quoting *Richmond*, 289 Kan. at 429-30); see *State v. Harris*, 293 Kan. 798, 813, 269 P.3d 820 (2012) (noting that this court has disapproved of any past loosening of K.S.A. 60-404 requirement of specific and timely objections); *King*, 288 Kan. at 348 ("[T]he legislature's intent in enacting K.S.A. 60-404 is clear: a party must lodge a timely and specific objection to the admission or exclusion of evidence in order to preserve the evidentiary question for review.").

Moreover, this court has declined to address confrontation issues for the first time on appeal. See, e.g., *McCaslin*, 291 Kan. at 708-09 (appellate issue on right of confrontation not preserved with a hearsay objection); *Dukes*, 290 Kan. at 489-90 (defendant failed to preserve confrontation rights issue for appeal); *State v. Bryant*, 272

Kan. 1204, 1208, 38 P.3d 661 (2002) (declined to entertain a Confrontation Clause challenge for the first time on appeal).

Consequently, we hold that Williams failed to preserve his Confrontation Clause issue.

## Jury Instruction Issues

Williams raises two jury instruction issues. Both arguments lack merit.

In the first of these issues, Williams argues that the trial court erred in denying his request for a limiting instruction regarding K.S.A. 60-455 evidence of prior drug transactions.

### K.S.A. 60-455 Limiting Instruction

During the first trial, which ended in a hung jury, the trial court granted an order in limine that prohibited the parties from mentioning specific instances of prior drug transactions involving the defendants. Before the second trial, the trial court indicated the order in limine would again apply. But just before the second trial, Phillips introduced a new theory of defense—that he accidentally killed Dyer during a drug deal. Consequently, Phillips waived the order in limine, and the trial court lifted the order as it applied to Phillips. Williams' and Kettler's counsel requested, however, that the order in limine still apply to their clients.

The parties agreed that any drug deal evidence relating to the events on the date of Dyer's death was admissible, and general evidence showing that witnesses and key players in the case knew each other through drug transactions was admissible. But the parties were prohibited from presenting evidence of *specific* prior drug transactions involving Williams or Kettler.

On appeal, Williams contends that the trial court's lifting of the order in limine against Phillips rendered the order in limine with respect to Williams "meaningless." He acknowledges that Phillips' introduction of prior misconduct evidence was helpful to Williams in that it tended to "exculpate Williams' liability on premeditation," but he argues it also "prejudiced Williams in the eyes of the jury" because Williams' efforts to hide his drug-dealing activities "appear[ed] evasive and disingenuous."

Further, Williams contends he requested a mistrial after the trial court denied his request for a limiting instruction. Several issues, including some procedural problems, relate to Williams' mistrial motion. But we need not delve into those problems if his basic premise—that the trial court should have given a K.S.A. 60-455 limiting instruction—is flawed, and we conclude that it is.

*Standards of Review*

The analysis that leads us to this conclusion is guided by the following steps and standards of review:

"For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

*Application of Standards*

As to the first step, Williams objected to the trial court's failure to give the instruction. Thus, the question of whether a limiting instruction should have been given was preserved. See K.S.A. 22-3414(3); *State v. Ellmaker*, 289 Kan. 1132, 1138-39, 221 P.3d 1105 (2009), *cert. denied* 560 U.S. 966 (2010). Nevertheless, the instruction was neither legally nor factually appropriate.

The trial court acknowledged the general rule that a trial court "must give a limiting instruction informing the jury of the specific purpose for admission" of evidence that a person committed a crime or civil wrong on a specified occasion. *State v. Gunby*, 282 Kan. 39, Syl. ¶ 3, 144 P.3d 647 (2006); see K.S.A. 60-455. But the trial court ruled, in part, that those circumstances did not apply because no K.S.A. 60-455 evidence had been presented at trial that showed Williams' involvement in any drug transactions other than Phillips' sale to Shaw just before the shooting. As to aiding and

abetting the sale to Shaw, "K.S.A. 60-455 does not apply if the evidence relates to crimes or civil wrongs committed as part of the events surrounding the crimes for which [a defendant] was on trial—that is, the res gestae of the crime." *State v. King*, 297 Kan. 955, 964, 305 P.3d 641 (2013); see K.S.A. 60-455 ("evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible . . . as the basis for an inference that the person committed another crime or civil wrong on another specified occasion."); *State v. Peppers*, 294 Kan. 377, 389, 276 P.3d 148 (2012) ("Our decision in *Gunby*[, 282 Kan. at 59-63,] eliminated res gestae as an independent basis for the admission of evidence. It did not eliminate the admission of evidence of events surrounding a commission of the crime under the applicable rules of evidence."). *King*, 297 Kan. at 964.

In attacking the trial court's ruling on appeal, Williams fails to point this court to any location in the trial transcript where the State, Phillips in his own defense, or any other witness introduced evidence of any specific drug transactions—either prior or subsequent to the sale to Shaw—involving Williams. This is critical to our analysis because factual assertions in an appellate brief are required to be keyed to the record on appeal. See Rule 6.02(a)(4) (2013 Kan. Ct. R. Annot. 39); *State v. Sappington*, 285 Kan. 176, 192, 169 P.3d 1107 (2007) (party alleging trial error has the burden to designate a record affirmatively showing prejudicial error). Neither the jury nor this court were advised of anything in the record establishing Williams' past history of drug transactions. As the trial court concluded, the order in limine accomplished its purpose and this evidence was not admitted during the trial.

At most there was only evidence that Williams associated with individuals who sold drugs. But association with someone who has committed a crime is not a prior crime or civil wrong that would be covered by K.S.A. 60-455; see *State v. Green*, 280 Kan. 758, 761-62, 127 P.3d 241, *cert. denied* 549 U.S. 913 (2006). Williams emphatically makes this point when presenting his argument that his mere association was insufficient evidence that he had aided and abetted the commission of premeditated first-degree murder.

Yet, Williams' association with Phillips, an admitted drug dealer, is all that was established in the evidentiary record.

Because the requested limiting instruction was not legally or factually appropriate, the trial court did not err in refusing to give a limiting instruction.

### Expanded Definition of Possession

Next, Williams contends that the trial court erred by instructing the jury on an expanded definition of possession, which included constructive possession. This issue arose in relation to the charge of criminal possession of a firearm, in violation of K.S.A. 21-4204(a)(4)(A). The State requested the expanded definition of possession, and the trial court gave the following jury instruction:

"Possession of an object requires that the defendant have control over the object with knowledge of and the intent to have such control. To possess an object, the defendant must have knowledge of the presence of the object with the intent to exercise control over it. Control means to exercise a restraining or directing influence over the object.

"Possession may be immediate and exclusive, jointly held with another, or constructive. Joint possession occurs when two or more persons, who have the power or control and intent to manage property, exercise the same jointly. *Constructive possession is knowingly keeping an object in a place to which the defendant has some measure of access and right of control.*" (Emphasis added.)

The parties do not dispute that Williams objected to this instruction. Williams takes issue with the italicized portion of the jury instruction. The trial court found the above-quoted instruction contains correct statements of law, and because the previous jury in the first trial had submitted a question during deliberations regarding constructive possession, the court decided to give an expanded definition of possession to the jury in the second trial.

### Instruction Was Legally Appropriate

Williams' arguments focus on whether the instruction was legally appropriate. He argues the constructive possession language was not legally appropriate because it conveyed an inaccurate statement of law. He fails to explain what was legally inaccurate, however. Instead, for explanation, he contemplates the instruction could have misled the jury "into thinking that because any defend-

ant could have grabbed the gun out of the car's dash, that any could have possessed it," or the jury "could have thought that because Williams might have grabbed the gun from another defendant, he constructively possessed it." He does not explain why any of those scenarios would have been legally inappropriate.

Further, contrary to the implications of Williams' argument, the jury instruction is not inconsistent with legal definitions of the term "possession." Black's Law Dictionary 1282 (9th ed. 2009) defines "constructive possession" as "[c]ontrol or dominion over a property without actual possession or custody of it." "Possession" is defined as "[t]he fact of having or holding property in one's power; the exercise of dominion over property," and "[t]he right under which one may exercise control over something to the exclusion of all others; the continuing exercise of a claim to the exclusive use of a material object." Black's Law Dictionary 1281 (9th ed. 2009). "Joint possession" is "[p]ossession shared by two or more persons." Black's Law Dictionary 1282 (9th ed. 2009).

In requesting the expanded possession instruction and arguing that it was appropriate to instruct the jury on constructive possession, the State relied on several cases, two of which are particularly helpful to our analysis—*State v. Porter*, 201 Kan. 778, 443 P.2d 360 (1968), *cert. denied* 393 U.S. 1108 (1969), and *State v. Cunningham*, 236 Kan. 842, 695 P.2d 1280 (1985). Neither case involved guidance on *when* to give a jury instruction on constructive possession, but both addressed the general concepts of joint or constructive possession.

In *Porter*, the court discussed joint possession in the context of examining the meaning of "possession and control" of a pistol, as contemplated by the felony firearms statute in effect at that time, K.S.A. 21-2611 (Corrick). The court held the charge of possession was proper where the pistol was retrieved from a drawer in a bedroom the defendant shared with his wife. 201 Kan. at 781-82. In coming to this holding, the *Porter* court discussed *State v. Hart*, 200 Kan. 153, 434 P.2d 999 (1967), in which the charge was possession of burglary tools in violation of K.S.A. 21-2437 (Corrick). In response to the defendant's claim that one of the tools was found on his companion and hence was inadmissible as to him, the *Hart*

court said that possession of burglary tools may be joint as well as individual, and that two or more persons may have the power of control over them and intend to control and use the tools jointly. *Hart*, 200 Kan. at 161. The *Porter* court found the same rule applicable to the possession and control of prohibited guns. *Porter*, 201 Kan. at 782.

Constructive possession was at issue in *Cunningham*, where the court held that the unlawful possession of a firearm under K.S.A. 21-4204 (Ensley 1981) does not require proof of the defendant's "actual control" of the weapon. 236 Kan. at 845-46. The case arose when two masked burglars entered a store, and the owner exchanged gunfire with one of the men before they fled. The defendant argued that the trial court should have dismissed the charge of possession of a firearm because evidence showed only one of the burglars carried a gun, and there was no proof that the defendant had actual control of the weapon. The *Cunningham* court rejected the argument that actual control was required: "[A] holding that where one of two indistinguishable burglars wields a gun during the crime either or both may be charged with unlawful possession of the firearm is consistent with traditional aiding and abetting law." 236 Kan. at 846.

The *Cunningham* court also cited other cases in which defendants were convicted of unlawful possession of a firearm when there was no evidence of " 'actual control.' " 236 Kan. at 845-46; see *State v. Boster*, 4 Kan. App. 2d 355, 361, 606 P.2d 1035 (1980) (charge of unlawful possession proper where gun found in trunk of a car over which defendant asserted control); *State v. Goodman*, 3 Kan. App. 2d 619, 627, 599 P.2d 327 (1979) (gun found in defendant's car adequate to support charge of unlawful possession even though there was evidence there might have been two or more persons occupying the vehicle before it was abandoned). Other states have upheld convictions for possessing firearms or contraband on the basis of constructive possession and have assigned a similar definition to "constructive possession." See, *e.g.*, *People v. McIntyre*, 962 N.E.2d 1108, 1112 (Ill. App. 2011) (for constructive possession charge, State had to establish that defendant had knowledge of the presence of the weapon and had im-

mediate and exclusive control over the area where weapon was found); *Commonwealth v. Humphries*, 465 Mass. 762, 768 n.6, 991 N.E.2d 652 (2013) (to prove constructive possession of firearm, must show defendant had ability to exercise dominion and control over the firearm); *State v. Hankerson*, 70 Ohio St. 2d 87, 91, 434 N.E.2d 1362 (1982) (constructive possession exists when an individual exercises dominion and control over an object and requires a showing that person was conscious of object's presence); *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (stating a person constructively possesses an item when he or she has " ' "the power and intention at a given time to exercise dominion and control over . . . [the contraband] either directly or through others" ' ").

In light of this authority, Williams fails to convince us the statement in the jury instruction regarding constructive possession was an inaccurate legal statement or that it somehow misled the jury. The definition, as given to the jury, encompassed both knowingly keeping the weapon and controlling or having the ability to exercise control over the weapon and its hiding place. Further, the instruction as a whole explained actual possession and constructive possession, as well as joint possession.

### Instruction Was Factually Appropriate

Moreover, there was evidence that Williams had constructive possession of the gun; therefore, the jury instruction was factually appropriate. Williams takes issue with the "weight" of the evidence, but this court does not reweigh evidence. Rather, in considering whether an instruction is factually appropriate, the evidence that would support the instruction must be viewed in the light most favorable to the requesting party. *Plummer*, 295 Kan. 156, Syl. ¶ 1; see *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011).

Here, the State presented evidence that the gun belonged to Williams and that the gun was hidden inside the dashboard of Williams' car, a vehicle and location over which Williams had control. There was also evidence of Williams' actual physical possession of the gun. Stewart testified that Williams came over to her home on the night of Dyer's death and he had a 9 mm pistol. She further testified that Williams dropped the magazine out of the gun, took

the bullets out, and wiped down the gun. Based on their conversation, Stewart believed the gun belonged to Williams and that he had shot someone. According to Stewart, Williams gave her the gun and asked her to hide it.

Given the evidence that at various times Williams actually, jointly, and constructively had possession of the 9 mm Ruger, the trial court did not err by giving an expanded definition of possession, which included constructive possession.

## MISTRIAL BASED ON WITNESS AND JUROR MISCONDUCT

Next we consider Williams' contention that he was denied his constitutional right to a fair trial due to prejudicial conduct inside and outside the courtroom. Specifically, he complains about two courtroom interactions that occurred between Phillips and two witnesses—Phillips' wife, Talisha Phillips, and Armstrong's girlfriend, Latoya Austin. Williams also complains about the trial court's dismissal of one juror (who was then replaced with an alternate) based on comments communicated by the juror to a third party outside the courtroom during a break. Significantly, none of these occurrences—either individually or cumulatively—prompted Williams' counsel or any of his codefendants' attorneys to request a mistrial. Yet, on appeal, Williams argues the trial court erred by not declaring a mistrial when these circumstances allegedly denied him a fair trial. We reject his contentions.

### Interaction Between Phillips and His Wife

With respect to Phillips' wife Talisha, after her testimony, during which she basically tried to provide an alibi for Phillips on the afternoon and evening of the day when Dyer was shot, one of the jurors reported that during Talisha's testimony he had witnessed Phillips "mouth" to his wife the phrase, "Stop lying." The juror had not discussed this observation with any other jurors.

When Phillips' defense counsel suggested that the juror be questioned on the record, Williams' defense counsel stated: "Judge, my thought is, it's not testimony, therefore it's not to be considered by him. . . . [H]e might have to receive some instruction not to share it. . . . It's not the witness' demeanor, it's the conduct. And it's not

on the record, except in this way [via the discussion between the judge and defendants' counsel]." After the court heard from Kettler's defense counsel, Williams' defense counsel then clarified: "Judge, can I add this, please? Since [the juror] didn't say anything to the bailiff, [indicating] that he couldn't sit fairly and impartially, it's not an issue we could address." The prosecutor agreed, and the court simply stated: "Okay. All right." Thus, the court acceded to Williams' request, and from the transcript, it appears that no further action was taken on the matter.

*Interaction Between Austin and Phillips*

The next day, Austin testified. The trial transcript shows that after Austin was finished testifying, she got up and as she walked by Phillips, she pointed her finger at Phillips and said he better talk to his "baby mama." Phillips' defense counsel asked the trial court if he could poll the jurors to ask if they heard the comment and whether it impacted them. When the court asked the other attorneys if they wanted to respond or weigh in on Phillips' request, Williams' defense counsel stated: "I don't have any position on it." Then, when asked a second time whether "[a]nybody else want[ed] to weigh in on this issue," Williams' defense counsel said: "No."

Ultimately, the trial court denied Phillips' request to poll the jury but did offer an admonition to the jury. The court told the jury to disregard the statement made by Austin as she was leaving the witness stand and emphasized that the jury should only consider "testimony that occurs when someone is under oath and on the stand." The court's admonition was not requested by Williams' defense counsel.

*Standards of Review*

With regard to prejudicial conduct in general, in *State v. Ward,* 292 Kan. 541, Syl. ¶ 1, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012), this court stated:

"K.S.A. 22-3423(1)(c) permits a trial court to declare a mistrial because of prejudicial conduct, in or outside the courtroom, which makes it impossible to proceed with the trial without injustice to the defendant or the prosecution. Applying the statute, a trial court must engage in a two-step analysis. First, the trial court must decide if there is some fundamental failure of the proceeding. If so, in the second

step of the analysis, the trial court must assess whether it is possible to continue the trial without an injustice. This means that if there is prejudicial conduct, the trial court must determine if the damaging effect can be removed or mitigated by admonition or instruction to the jury. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial."

On appeal, the trial court's decision denying a motion for mistrial is reviewed under an abuse of discretion standard. The rubric for analysis of whether the trial court abused its discretion in deciding if there was a fundamental failure in the proceeding varies with the nature of the alleged misconduct, such as whether the allegation is based on the actions of a witness, a juror, a bystander or on prosecutorial misconduct or evidentiary error. 292 Kan. 541, Syl. ¶¶ 2, 4. The burden of demonstrating error is on the party alleging the abuse. *State v. Wells*, 297 Kan. 741, 754, 305 P.3d 568 (2013).
Once an error has been established,

"[t]o determine whether an error makes it impossible to proceed with the trial without injustice, a court must assess whether the fundamental failure affected a party's substantial rights under Kansas' harmless error statutes, K.S.A. 60-261 and K.S.A. 60-2105, if a right guaranteed by the United States Constitution is not implicated or else under *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), if such a constitutional right is implicated." *Ward*, 292 Kan. 541, Syl. ¶ 5.

Under *Chapman*, the burden is on the party benefiting from the error to prove beyond a reasonable doubt that the error complained of did not affect substantial rights. 292 Kan. at 578.
For authority on the standard of review in juror misconduct cases, both parties cite *State v. Fenton*, 228 Kan. 658, 664, 620 P.2d 813 (1980), in which the court stated that the party claiming prejudice has the burden of establishing such prejudice. But *Fenton* predates *Ward*, where this court stated: "We recognize that imposing that burden on the State at this point changes the rule because, as noted, past Kansas cases have placed the burden of establishing prejudice on the defendant in mistrial cases." 292 Kan. at 578. Neither party discusses *Ward*, although the appellate briefs in this case were filed after *Ward* was decided. Regardless, *Ward* applies and the State has the burden in this case.

*No Merit to Williams' Arguments*

While the State has not raised a preservation objection, as we previously intimated, the fact that Williams' defense counsel did not feel these outbursts warranted a mistrial or even corrective action suggests to us neither situation constituted a fundamental failure in the proceedings. Further, there is nothing in the record that makes us believe these short outbursts warranted a mistrial. We hold that the trial court did not abuse its discretion in dealing with the two interactions between Phillips and the two witnesses in the courtroom.

Even if it could be concluded that these courtroom interactions constituted some fundamental failure in the proceeding, any error was harmless. As noted by the State, the interaction between Phillips and his wife was brief and was only acknowledged by one juror who never indicated that it would affect his impartiality. The interaction between Phillips and Austin was more demonstrative but happened after Austin's testimony had concluded, and it is not clear whether her interaction with Phillips was even seen by the jurors. Further, the trial court gave a limiting instruction to cure any potential prejudice, and appellate courts presume that the jury followed the court's admonition. See *State v. Barncord*, 240 Kan. 35, 44-45, 726 P.2d 1322 (1986). Finally, even under the *Chapman* harmless error standard, we are confident beyond a reasonable doubt that these courtroom incidents did not affect Williams' substantial rights. In other words, there is no reasonable possibility the jury would have rendered a different verdict if the incidents had not occurred. *State v. Inkelaar*, 293 Kan. 414, 436, 264 P.3d 81 (2011).

*Alleged Juror Misconduct*

Next, Williams complains about the trial court's dismissal of one juror based on comments communicated by the juror to a third party outside the courtroom during a break. The court then replaced the dismissed juror with an alternate, but it did so at the request of Williams' defense counsel and the other defense attorneys. No counsel contended that this juror contaminated other jurors. Nor did Williams move for a mistrial. Further, as the State

aptly points out in its appellate brief, Williams fails to explain on appeal what specific details about this juror's dismissal from the jury can be characterized as "error."

This court has stated that "where alleged juror misconduct claimed as prejudicial is known by the party or his counsel before the verdict is rendered, and no objection is made nor is the matter brought to the court's attention, the party cannot later assert the misconduct as grounds for a new trial. [Citations omitted.]" *State v. Wheaton*, 240 Kan. 345, 354, 729 P.2d 1183 (1986); see *State v. Williams*, 298 Kan. 1075, Syl. ¶ 4, 319 P.3d 528 (2014) (citing Rule 6.02[a][5] [2013 Kan. Ct. R. Annot. 39-40] and noting that "rules of this court require a party briefing an issue on appeal to make 'a reference to the specific location in the record on appeal where the issue was raised and ruled upon. If not raised below, explain why the issue is properly before the court.' "); *State v. Buggs*, 219 Kan. 203, 208, 547 P.2d 720 (1976) (stating the rule is "a corollary" of the contemporaneous objection rule as to evidence and the requirement of an objection to erroneous instructions; "[a] party is not permitted to remain silent in the face of known error, gamble on the verdict, and show his hole card only if he loses"). Granted, once an error is shown and a constitutional violation is implicated, the burden of production is on the party benefitting from the error. *Ward*, 292 Kan. at 577-78. Arguably, that is the State in this case. But Williams fails to satisfy *his* burden of directing this court's attention to what he considers to be the error.

Regardless, any juror misconduct was remedied with the trial court's assignment of a replacement juror from the alternates that had been selected during voir dire. It is well settled that

"a defendant has no right to any particular juror or to the original 12 jurors empanelled to hear the case. [Citations omitted.] Furthermore, it is well established that the decision to discharge a juror lies within the sound discretion of the trial judge. [Citations omitted.] 'The defendant carries the burden of demonstrating substantial prejudice before an appellate court will find that the trial court abused its discretion.' " *State v. Lowrance*, 298 Kan. 274, 287, 312 P.3d 328 (2013).

Williams makes no argument explaining how the trial court abused its discretion in replacing the juror. Also, even under the

*Chapman* harmless error standard, there is no reasonable possibility that the juror's misconduct or the trial court's dismissal of the juror and assignment of a replacement juror affected the outcome of the trial. See *Inkelaar,* 293 Kan. at 436. Hence, Williams' arguments are without merit.

### DEMONSTRATIVE PHOTOGRAPH WAS ADMISSIBLE

Williams contends that the trial court erred by admitting a photograph—Exhibit 208—of the dashboard of Williams' car depicting an installed stereo, along with the testimony of a law enforcement detective detailing his attempt to reconstruct the State's gun-in-the-dash theory as rebuttal evidence. This contention lacks merit.

*Evidence at Issue*

In this case, the detective testified on behalf of the State. During the detective's direct examination, he stated, without objection, that he had learned from Armstrong's sworn statement that the gun used to kill Dyer had been hidden inside the dashboard of Williams' car and had been removed by Kettler on the way to the liquor store. The detective explained that after this information came to light, he took steps to verify whether a gun could be concealed in that location. At the time the detective examined Williams' car, there was an open hole in the dashboard where a stereo would have been installed. The detective testified that he went to the law enforcement impound lot, where the car was being held, and placed his 9 mm Glock, which was his service weapon, inside the dashboard.

Four photographs were admitted after that testimony. Williams and his codefendants objected on the basis of "foundation," and the trial judge stated: "I believe there's enough as far as foundation. I think the objections really go to weight, not admissibility." The photographs depicted the interior dashboard area of Williams' car, and one photograph showed the detective's gun inside the open hole.

During a voir dire examination of the witness, the detective stated there was no car stereo installed when he examined Williams' car. It was later established that the car had been burglarized

at the impound lot and the stereo had been stolen. On cross-examination, Williams' defense counsel asked the detective whether he had brought a radio to install into the opening in order to see if a gun could fit behind it. The detective said, "No," he had not brought one with him.

Before the detective was recalled as a rebuttal witness, he returned to the impound lot with a stereo. Then, later on rebuttal, the State introduced three additional photographs of the dashboard of Williams' car, one of which showed a stereo that had been installed in the proper location. This is the one photograph, Exhibit 208, about which Williams complains on appeal. Williams' defense counsel objected to the admission of the photograph on the grounds that "it doesn't simulate the evidence, it would be of no probative value." Williams did not object to the detective's rebuttal testimony, however.

The detective's rebuttal testimony established that when he returned to the impound lot he placed his "9 millimeter [Glock] into the back as far as I could of the opening and then I placed the stereo in, again to see if it would actually fit flush up against the outer portion of the opening." When asked if the stereo, which he described as a "standard in-car stereo," fit flush with the gun behind it, the detective answered, "Yes, it [did]. The handgun was in an up and down position (indicating)." When asked by Williams' defense counsel about wiring the stereo, the detective acknowledged that he did not connect the wires on the stereo to the car.

Williams argues on appeal that this detail regarding the wiring was significant because the original stereo had been fully functional; there was evidence that Williams and the others were listening to loud music on the way to Shaw's house. The trial court concluded that Exhibit 208 was admissible, finding that "the objections go to weight, not admissibility."

## Standards Regarding Demonstrative Photographs

Because Williams' objection was limited to the photograph, the trial court had to consider principles relating to demonstrative evidence. Generally, in determining whether demonstrative photographs should be admitted, a trial court must determine whether

they are relevant and whether a proper foundation has been laid. *State v. Crum*, 286 Kan. 145, 159, 184 P.3d 222 (2008); *State v. Roberts*, 261 Kan. 320, Syl. ¶ 3, 931 P.2d 683 (1997); *State v. Kendig*, 233 Kan. 890, 892, 666 P.2d 684 (1983); see *State v. Kirby*, 272 Kan. 1170, 1186, 39 P.3d 1 (2002). A proper foundation exists when the witness demonstrates he or she possesses the requisite skill and experience to conduct the demonstration and displays the accuracy and reliability of the models and photographs. *Kendig*, 233 Kan. at 892 (citing *State v. Peoples*, 227 Kan. 127, 132, 605 P.2d 135 [1980]). To the extent that Exhibit 208 is a photograph of a reconstructed scene, the proper test is whether the conditions are the same or substantially similar to the events depicted. Minor differences go to the weight of the evidence rather than its admissibility. The question of what constitutes a permissible variation depends on whether it tends to confuse or mislead the jury. *Kendig*, 233 Kan. at 893; see *State v. Miller*, 284 Kan. 682, 696, 163 P.3d 267 (2007) ("[D]emonstrative photographs that serve to better illustrate a witness' testimony to the jury are admissible when the photographs themselves, if viewed in a vacuum, would be otherwise objectionable."); *State v. Suing*, 210 Kan. 363, 365, 502 P.2d 718 (1972) (" 'When a picture is offered as a general representation of a scene or object, very slight proof of reliability may be sufficient; but when it is offered as representing slight differences of height, breadth or length, much more convincing proof of dependability should be required.' ").

The trial court has broad discretion when making these determinations, and the court's decision to admit such photographs must be accepted on appellate review absent a showing of abuse of discretion. *Crum*, 286 Kan. at 159; *Kendig*, 233 Kan. at 893; See *State v. Jones*, 202 Kan. 31, 42, 446 P.2d 851 (1968).

*No Abuse of Discretion*

Williams' claim that the admission of Exhibit 208 and the detective's rebuttal testimony constituted an abuse of discretion is unpersuasive. First, the photograph was relevant to the State's theory that the murder weapon was concealed in the dashboard of Williams' car, was retrieved from that location on the way to find

Dyer, and was eventually used to shoot and kill Dyer. The photograph also corroborated Armstrong's statements indicating that it was possible to hide a gun behind the stereo.

Williams complains that Exhibit 208 showed a stereo featuring a cassette tape player, whereas the original stereo featured a CD player, and he argues there was no "testimony or evidence about the size of the radio that Mr. Williams [previously] installed in his car." These points were argued to the jury, and they are not entirely correct. In fact, Williams *was* asked at trial about the size of his car stereo. He described that it went into the dash approximately 5 inches, and he estimated the height and width of the stereo with hand gestures. Nevertheless, as acknowledged by the State in its appellate brief, there were some inconsistencies between the two stereos. But the details depicted in the photograph, which showed a "standard" size car stereo and focused on the dashboard of Williams' car, the space behind the stereo, and a concealed gun, were substantially similar. There was only a finite amount of space in the cutout of the dashboard to fit a small stereo, and the detective's testimony and photograph demonstrated that a 9 mm pistol could fit behind a stereo of standard size.

Although there may have been some discrepancies between the original stereo and the one in the photograph, minor differences go to the weight of the evidence rather than its admissibility. *Kendig*, 233 Kan. at 893; 29A Am. Jur., Evidence § 999, p. 323 ("[P]hotographic evidence of reconstructed events is admissible as long as a proper foundation is laid and any discrepancies between the reconstruction and the original event are explained."). Further, Williams' defense counsel was able to question the detective thoroughly to explain to the jury why Williams believed the photograph failed to accurately represent the gun-in-the-dash theory. Thus, the jury was made aware of possible differences.

Consequently, we conclude that the trial court did not abuse its discretion in admitting the rebuttal evidence.

## No Cumulative Error

Finally, Williams contends that even if no single error at trial was sufficient to require reversal and remand, the cumulative effect

of errors nevertheless deprived him of a fair trial. But the only error found in this case was in the prosecutor's closing argument, which was determined to be harmless. Without more errors to accumulate, the error remains harmless. See *State v. Houston*, 289 Kan. 252, 277, 213 P.3d 728 (2009) ("The presence of one [trial] error is obviously insufficient to accumulate.").

Affirmed.