NOT DESIGNATED FOR PUBLICATION

No. 112,771

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RAYMOND B. BUBERWA,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; GREGORY L. WALLER, judge. Opinion filed February 26, 2016. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., PIERRON, J., and WALKER, S.J.

*Per Curiam*: Raymond B. Buberwa appeals his convictions for two counts of aggravated indecent liberties with a child in violation of K.S.A. 2015 Supp. 21-5506(b)(3)(A). He argues the convictions are multiplicitous because the jury was confused by the State's evidence, thus they should be reversed. He also argues the jury instruction on "intent" was unconstitutional and prevented the State from meeting its burden of proof. He contends the prosecutor committed misconduct by commenting on Buberwa's failure to testify as well as misstating the evidence and the law regarding Buberwa's voluntary intoxication defense. Finally, Buberwa argues cumulative error prevented him from receiving a fair trial. We affirm.

1

The victim in this case, B.K.M., is the daughter of F.M. In the fall 2013, F.M. was nearing the end of a romantic relationship with K.P. The couple had one son, A.M., together. F.M. had another daughter, N.R. K.P. also had a son, J.Y., and a daughter, A. K.P. viewed B.K.M. as her stepdaughter.

One night in October, F.M. hosted a gathering at his house. K.P. and the five children were at the house that night. Some of F.M. and K.P.'s friends also came, including Buberwa and his wife, Gina Page. The couples knew each other because Page provided daycare for F.M. and K.P. By about 11 p.m., most of the guests had left. Buberwa and Page decided to stay the night at F.M.'s because they had been drinking. The four adults were drinking, talking, and listening to music on the main floor of the house. By this time, the children had gone to bed. B.K.M., N.R., and A., were sharing a room upstairs. The three girls were all sleeping on a single air mattress.

In the early morning hours, B.K.M. went downstairs to tell K.P. that Buberwa kept coming into the girls' room and bothering them. K.P. said she would take care of it and sent B.K.M. back to bed. K.P. told Buberwa never to go in the girls' room again. Buberwa's demeanor changed immediately after K.P spoke to him. He sat down on the couch and did not speak or move again for the rest of the evening.

The next day, K.P. asked B.K.M. to tell her exactly what had happened. B.K.M. said Buberwa had come into the girls' room several times the previous night. He had touched B.K.M. inside of her underwear in the front and touched her bottom. K.P. had B.K.M. repeat the story to Page and F.M. N.R. was also present while B.K.M. recalled what happened and appeared to be nodding her head in agreement. Someone then called the police.

An officer spoke briefly with K.P. at the home. The officers transported K.P., Page, F.M. and all five children to the offices of the Exploited and Missing Children's Unit (EMCU). At EMCU, Detective Kevin Brown interviewed B.K.M. B.K.M. stated she

had been sleeping on the air mattress between her two sisters when Buberwa entered their room a total of three times.

The first time, Buberwa repeatedly asked B.K.M. if she was okay, but he did not touch her. The second time, Buberwa pulled down the covers, lifted B.K.M's dress up to her stomach, placed his hand inside her underwear, and touched her front private area. The second visit lasted for a few minutes. Buberwa left the room for a few moments and then came back in. The third time, he moved A. out of the way and repeated the same sequence of events except B.K.M. said Buberwa touched her back private area rather than her front private area.

Another detective interviewed N.R. N.R. said she had heard the door to the girls' room slam and Buberwa asking questions. At some point she fell back asleep, but B.K.M. later got up, turned on the light, and began crying. B.K.M. told N.R. that Buberwa had touched her front private and bottom.

B.K.M. also met with Joyce Eby, a sexual assault nurse examiner. Eby testified B.K.M. told her that Buberwa had touched her on her "hiney." Eby asked B.K.M. what "hiney" meant and B.K.M. pointed to her vaginal area. B.K.M. also told Eby that Buberwa had touched her on her buttocks and the touches had been inside of her underwear. Eby performed a physical examination and a detailed genital examination, but she did not find anything noteworthy. Eby did not find this surprising because in her experience, incidents involving just touching usually do not lead to injury.

A couple of days later, Detective Brown interviewed Buberwa. Buberwa said he had been drinking and while he had not exactly blacked out, he was confused about what had happened that night. He admitted going into the girls' room, moving A.'s leg, and possibly touching B.K.M.'s leg. He claimed he moved A.'s leg to get the covers and brushed B.K.M.'s leg as he was covering the girls up. He then said "maybe one" time he touched B.K.M. in the area of her vagina. He also said he trusted B.K.M., and she

remembered more about that night than he did. Buberwa repeatedly insisted he had only touched B.K.M.'s leg and had no sexual intentions, but he also said at least two more times in the interview that he may have touched her in the groin area. He said he blacks out when he drinks and he could not remember everything that happened that night.

At trial, B.K.M. testified that on Buberwa's first visit to the girls' room, he repeatedly asked if she was okay. He then left the room but returned and touched B.K.M. underneath her underwear. Buberwa left the room, returned a third time, and did the same thing. At trial, however, B.K.M. testified that on both the second and third visits Buberwa had touched her on both her front and back privates.

A total of 10 witnesses testified at trial. The videos of Detective Brown's interviews with B.K.M., N.R., Page, and Buberwa were also shown at trial.

During the jury instruction conference, the State raised an issue with the "intent" instruction. Defense counsel had proposed the original instruction taken from PIK Crim. 4th 52.010—Culpable Mental State. The instruction read: "The State must prove that the defendant committed the crime intentionally. A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State." During the conference, the State objected to the use of this instruction because it would be redundant given the intent element in the instructions on the two counts of aggravated indecent liberties with a child. The State also argued the intent element in the instructions on the two counts would be clearer than the one in the intent instruction. The district court noted the PIK Crim. Committee had set forth that courts should instruct on intent. In response, the State proposed applying the intent instruction to the element of "lewd fondling or touching" rather than the crime as a whole. Defense counsel had no objection to this change. The new instruction read: "The State must prove that the defendant committed *lewd fondling or touching of B.K.M.* intentionally" rather than "The State must prove that the defendant committed *the crime* intentionally." (Emphasis added.) The second sentence remained the same. During the reading of the instructions, defense

4

counsel also had a discussion at the bench to inform the court that it had not read the intent instruction.

Both the State and defense counsel presented closing arguments. During the State's rebuttal in closing argument, the prosecutor opened with the following statement:

"Ladies and gentlemen, the question you need to answer is which story, which version of events is it? Was [Buberwa] so intoxicated that he cannot be held accountable? Or was he sober enough that he knew exactly what he was doing and maybe he doesn't want to admit it to himself, maybe he doesn't want to admit it to Detective Brown, and *maybe he doesn't want to admit it to you.*" (Emphasis added.)

Later in the rebuttal, the prosecutor addressed Buberwa's voluntary intoxication defense:

"Ladies and gentlemen, if he can remember the details leading up to touching [B.K.M.] . . . [w]hat explanation is there for this specific gap? Detective Brown asked him about his drinking. And [Buberwa] said he was a little drunk. The detective asked were you intoxicated? No. Were you blacked out? No. Later on in that same interview Detective Brown asked, Well, did you think you were blacking out? And [Buberwa] says, Well, it's not a blackout. Goes on, says a little bit more. He says, Well, confused, but not a blackout.

"Ladies and gentlemen, if he wasn't blacked out, if he was able to remember each and every step that he took and each and every thing that [B.K.M.] tells you–the only thing he's not able to say or not willing to say is that he rubbed her vagina–then that voluntar[y] intoxication doesn't hold any water. He can remember details immediately before and immediately after. You can use your own knowledge base, your own experience. Intoxication, does it happen in a moment? Does it create a blackout that lasts just a couple of minutes? That's a decision you have to decide. That is a question you have to answer. And I would submit to you in this situation what [Buberwa] did, what he's described it's not a blackout, ladies and gentlemen. He knew exactly what he was doing. Do not confuse . . . lowered inhibitions with voluntary intoxication."

5

During deliberations, the jury sent a question to the district court regarding the nature of the two counts: "What constitutes two separate counts: Did the defendant have to leave the room? Did the defendant have to return and commi[t] the second crime? We are having difficulty establishing the 'two counts.'" In discussing how to answer the question, the State pointed out that based on B.K.M.'s testimony at trial there were four possible acts that could constitute indecent liberties with a child. The court noted the jury would have to determine whether B.K.M.'s original account or her account at trial was more credible. Because the court did not want to misinform the jury about the law or impose its own understanding of the facts onto the jury, it opted to instruct the jury to reread the instructions.

The jury found Buberwa guilty of two counts of aggravated indecent liberties with a child. The district court sentenced Buberwa to 61 months' imprisonment for each count with the sentences to run consecutively.

Buberwa first argues on appeal that his convictions are multiplicious and should be reversed. Buberwa contends the State failed to elect which acts supported the two counts of aggravated indecent liberties with a child, therefore the jury possibly convicted him of two counts based on a single act. In the alternative, he argues we should reverse one of the two counts as being possibly multiplicious. Buberwa concedes he raises this issue for the first time on appeal. The State agrees Buberwa's convictions may present a multiplicity problem. The State argues we should reverse one count and remand the remaining count for resentencing.

Multiplicity is the charging of a single offense in several counts of a complaint or information. Courts must consider the issue of multiplicity because it creates the potential for multiple punishments for a single offense in violation of the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. *State v. Schoonover*, 281 Kan. 453, 475, 133 P.3d 48 (2006).

6

Both Buberwa and the State correctly note that Kansas appellate courts have traditionally been willing to hear multiplicity challenges for the first time on appeal "to serve the ends of justice or prevent a denial of fundamental rights." *State v. Weber*, 297 Kan. 805, 809, 304 P.3d 1262 (2013); *State v. Colston*, 290 Kan. 952, 971, 235 P.3d 1234 (2010). Recently, however, the Kansas Supreme Court has adopted the position that constitutional grounds for reversal raised for the first time on appeal are not properly before the appellate court for review. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015); *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014). While there are several exceptions to this rule, Supreme Court Rule 6.02(a)(5) (2015 Kan. Ct. R. Annot. 41) requires appellants to explain why an appellate court should consider an issue raised for the first time on appeal. *Godfrey*, 301 Kan. at 1043-44; *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).In *State v. Ochoa-Lara*, 52 Kan. App. 2d 86, 94-95, 362 P.3d 606 (2015), the court extended this holding to multiplicity challenges.

As noted above, Buberwa did not raise the multiplicity issue below. He does not explain in his brief why his multiplicity challenge should be considered for the first time on appeal as required by Rule 6.02(a)(5). Thus, he has not properly preserved the issue for appellate review. Given that he filed his brief several months before *Ochoa-Lara*, however, we will address the merits of his claim.

Whether counts are multiplicitous is a question of law subject to unlimited review. *Schoonover*, 281 Kan. at 462. In the case of multiplicity, the overarching question is whether the convictions are for the same offense. 281 Kan. at 496. Courts use a two-prong test to analyze whether convictions are multiplicitous. 281 Kan. at 496. First, courts determine whether the convictions arise from a unitary act. 281 Kan. at 496-97. Second, courts determine if there are one or two offenses by statutory definition. 281 Kan. at 497.

In applying the first prong of the test, courts may use the following factors: whether the act occurred at or near the same time or location, whether there was an intervening event between the acts, and whether there was a fresh impulse to engage in some of the conduct. 281 Kan. at 497. Leaving the room for even a short period of time can create two acts for the purposes of aggravated indecent liberties with a child, particularly if it breaks the chain of causality and gives the offender an opportunity to reconsider his or her felonious course of action. *State v. Sellers*, 292 Kan. 346, 359-60, 253 P.3d 20 (2011). In the present case, B.K.M. testified at trial that Buberwa came into her room and touched both her vagina and her buttocks. He left the room, returned, and again touched her on both her vagina and her buttocks. Each of Buberwa's visits could be considered separate acts because leaving the room presents an intervening act and a chance for Buberwa to develop a fresh impulse to return to the room and commit the touchings again. The individual touchings within each visit, however, occurred at the same time and same location without an intervening act. Under the first prong, then, they constitute a unitary act.

Determining if the touchings which occurred within each visit are separate acts requires proceeding to the second prong. If the multiplicity issue arises from multiple violations of a single statute, courts will apply the unit of prosecution test in analyzing the second prong. *Schoonover*, 281 Kan. at 497. Under the unit of prosecution test, the statutory definition of the crime determines what the legislature intended as the allowable unit of prosecution. 281 Kan. at 497-98. This court has interpreted the aggravated indecent liberties statute as defining multiple touchings at the same time and place as a single offense under K.S.A. 2015 Supp. 21-5506(b)(3)(A). See *State v. Davis*, No. 109,290, 2014 WL 4080061, at *4 (Kan. App. 2014) (citing *State v. Sprung*, 294 Kan. 300, 310, 277 P.3d 1100 [2012]) (unpublished opinion), *rev. denied* 302 Kan. ___ (2015). Even if Buberwa touched B.K.M. on different parts of her body within each visit, the touches would constitute one overall touching. Therefore, Buberwa's two visits constitute

8

separate acts and can support two separate convictions. The touchings within those visits, however, are a unitary act and can only support one conviction.

Buberwa argues the State did not clearly establish which two acts supported the two counts and this confused the jury as to what the two counts were. Kansas appellate courts have affirmed convictions that may possibly have been multiplicitous when the totality of the circumstances established the convictions were not. *State v. Kessler*, 276 Kan. 202, 208-09, 73 P.3d 761 (2003) (citing *State v. Dotson*, 256 Kan. 406, 411-12, 886 P.2d 356 [1994]); *State v. Elrod*, 38 Kan. App. 2d 453, 460, 166 P.3d 1067 (2007), *rev. denied* 285 Kan. 1175 (2008). In *Kessler*, the defendant was convicted of two counts of aggravated indecent liberties with a child. The victim testified at trial that the defendant touched his penis on one night and touched his penis and buttocks on a second night. The complaints specified that one count was for touching the victim's penis and one count was for touching the victim's buttocks, but it did not specify different dates for the touchings. On appeal, the defendant argued that because of the form of the complaints and the evidence, he may have been convicted of conduct occurring on the same night. The Kansas Supreme Court found the counts were not multiplicitous based on the totality of the circumstances. 276 Kan. at 209. The court explained the victim's testimony regarding both nights was equally credible, so there was no reason to infer the jury believed the victim's testimony regarding the second night but not his testimony regarding the first night; and the prosecutor also clarified in closing arguments that one count went to the first night and one count went to the second night. 276 Kan. at 209. In addition, the trial court instructed the jury to use its "'common knowledge and experience in regard to the matter about which a witness has testified'" and that "'[e]ach crime charged against [the defendant was] a separate and distinct offense.'" 276 Kan. at 209.

The totality of the circumstances in the present case suggest Buberwa's convictions were not multiplicitous. B.K.M.'s initial statements to Detective Brown and Eby were that Buberwa touched her front private on his first visit and her back private on

9

his second visit. At trial, she testified he touched her both places on both visits. While she was not consistent about where Buberwa had touched her, she was consistent that Buberwa came in her room twice and touched her both times. Based on these consistencies, there is no reason to infer the jury believed her testimony at trial regarding where Buberwa had touched her but not her statements regarding how many times he entered her room. Buberwa himself confirmed he was in the room one time, but he also only admitted to a possibility of touching B.K.M. in the vaginal area, not on her buttocks. If the jury had believed Buberwa's statement, there would likely only be one conviction. Thus, the statements and testimony of B.K.M. and Buberwa do not present a reason to infer the jury was confused as to the number of times Buberwa entered the room.

In addition, any possible confusion would have been cleared up by the State's closing argument and the jury instructions. The prosecutors made a number of statements clarifying that the two counts went to the two visits by Buberwa. These included:

> "[O]n these two occasions on this one day, did he go in and touch this little girl sexually? . . .
>
> . . . .
>
> "[O]ne for each time that he came in and touched her, one for each touching that he committed. . . .
>
> . . . .
>
> ". . . The second time he rubbed her on her vagina. Maybe on her buttocks as well, but specifically on that second occasion the touching that he did on [B.K.A.] was sexual. And then he comes in a third time and he engages in sexual touching of her again. He fondled her, rubbing on her buttocks."

The jury was also instructed regarding witness testimony and the distinct and separate nature of the crimes charged. Moreover, the State presented sufficient evidence at trial to establish two separate acts occurred. B.K.M. testified at trial Buberwa entered her room multiple times, and this was consistent with her prior statements. Furthermore, her testimony was corroborated in part by K.P., N.R., and Buberwa himself.

10

Buberwa's case is distinguishable from *Kessler* because the jury did ask the court to clarify what the two counts were. Buberwa points to this as proof that the jury was confused and may have convicted Buberwa of two counts based on one overall touching. The jury's question, however, is focused on Buberwa leaving the room and returning, not the individual touchings. From the question, the jury appears unclear only as to whether leaving the room for a period of time and returning was sufficient to establish two separate acts and, thus, two counts.

Given the totality of the circumstances, Buberwa's convictions were not multiplicitous. Sufficient evidence established that two separate acts occurred in Buberwa's visiting the girls' room twice. The State referenced these visits as the two separate acts, and the jury was given clarifying instructions. Therefore, both convictions are affirmed.

Buberwa next argues the jury instruction on intent was unconstitutional and prevented the State from meeting its burden of proof. Buberwa contends the recently revised definition of "intentionally," as included in the jury instruction, is completely subjective and cannot be proven absent a statement from the accused. Furthermore, as the jury instructions were given in this case, the State had to prove Buberwa "intended to intend" to arouse or satisfy the sexual desires of anyone. According to Buberwa, there is no possible way to prove someone intended to intend, thus the State must have failed to meet its burden of proof.

The State argues any problems with the intent instruction were invited error and are barred from appellate review. As the State points out (and Buberwa fails to mention), the jury instruction on intent was proposed by defense counsel. Furthermore, the State contends the instruction was not problematic because the State may prove intent with circumstantial evidence.

11

Under the invited error doctrine, a litigant may not invite error and then complain of the error on appeal. *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014). When the court gives the defendant's requested instruction to the jury, the defendant cannot complain the requested instruction was error on appeal. *State v. Bailey*, 292 Kan. 449, 459, 255 P.3d 19 (2011). Additionally, a defendant cannot challenge an instruction on appeal when there has been an on-the-record agreement to the wording of the instruction at trial, even if the instruction was clearly erroneous under K.S.A. 2015 Supp. 22-3414(3). *State v. Peppers*, 294 Kan. 377, 393, 276 P.3d 148 (2012).

In the present case, defense counsel not only requested the instruction, she agreed to a minor change in wording on the record. During the jury instruction conference, the State pointed out the possible inadequacies of defense counsel's proposed instruction prior to its use, claiming it was redundant and unclear. The State proposed a change, but the change merely changed the words "the crime" to "lewd fondling and touching." Since "lewd fondling or touching" is an element of aggravated indecent liberties with a child, the intent instruction would have applied to this element either way. Furthermore, defense counsel agreed to this change, claiming use of the name of the crime, rather than the specific element of lewd fondling or touching, might confuse the jury. Given that defense counsel both proposed the instruction and agreed to the wording on record, the invited error doctrine bars Buberwa from raising this issue on appeal, even if the intent instruction was clearly erroneous.

In this case, the error does not appear to have been due to defense counsel's negligence or inadvertence. Defense counsel proposed the instruction. The State pointed out the flaws to the instruction in front of defense counsel, but defense counsel did not suggest any changes. Defense counsel agreed on the record to the changes suggested by the State and even stopped the judge to notify him that he had forgotten to read the intent instruction. All this suggests the use of the instruction was part of trial strategy. Furthermore, Buberwa has not provided any evidence that the inclusion of the instruction

12

was due to defense counsel's negligence. Thus, even if Buberwa was able to demonstrate the invited error had consequences of constitutional magnitude, we will not review the error.

Buberwa also argues he did not have a fair trial due to prosecutorial misconduct. He specifically points to comments the prosecutor made during the State's rebuttal in closing argument. He claims the prosecutor's comment about Buberwa not wanting to admit his intentions to the jury was a comment on Buberwa's decision not to testify at trial. Buberwa also contends the prosecutor's comments about his intoxication on the night of the incident misstated the evidence and misstated the law on voluntary intoxication. The State argues the prosecutor's comments were responses to defense counsel's arguments and, in context, were not improper. Furthermore, the State contends even if the comments were improper, they were not gross or flagrant or the product of ill will; given the strength of the evidence at trial, the comments would not have had any effect on the outcome of the jury's verdict.

A claim of prosecutorial misconduct based on comments made during closing argument will be reviewed on appeal even when the defendant did not make a contemporaneous objection at trial. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200, *cert. denied* 133 S. Ct. 529 (2012). Appellate courts use a two-step-analysis when reviewing an allegation of prosecutorial misconduct involving improper comments to the jury. First, the court determines whether the prosecutor's comments were outside the wide latitude granted to prosecutors when discussing the evidence. If so, the comments constitute misconduct, and the appellate court must then determine whether the comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Roeder*, 300 Kan. 901, 932-33, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015).

In the second step of the two-step analysis, the appellate court considers whether the misconduct: (1) was gross and flagrant; (2) showed ill will on the prosecutor's part; and (3) would likely have had little weight in the minds of jurors because the evidence was of such a direct and overwhelming nature. *State v. Williams*, 299 Kan. 509, 540, 324 P.3d 1078 (2014). No individual factor is controlling. Before the third factor can ever override the first two factors, an appellate court must determine any misconduct was harmless under both K.S.A. 2015 Supp. 60-261 and *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Williams*, 299 Kan. at 540-41. Under the *Chapman* constitutional harmless error test, the party benefitting from any prosecutorial misconduct must prove beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record, *i.e.*, there is no reasonable possibility that the error contributed to the verdict. Under the Kansas statutory harmless error test, the court must determine whether there is a reasonable probability that the error affected the outcome of the trial in light of the entire record. *Williams*, 299 Kan. at 541.

*Reference to Buberwa's Failure to Testify*

Buberwa contends the prosecutor committed misconduct by commenting on Buberwa's failure to testify at trial. Buberwa argues the prosecutor's statement that " maybe he doesn't want to admit it to you" was a comment on his failure to testify. The State contends that, in context, the statement was about Buberwa's interview with Detective Brown.

A prosecutor is prohibited from making direct, adverse comments on a defendant's failure to testify. A prosecutor is also prohibited from making indirect comments if the language used was manifestly intended or of such a character that the jury would necessarily take it as a comment on the defendant's failure to testify. *State v. Harris*, 279 Kan. 163, 173, 105 P.3d 1258 (2005). The Kansas Supreme Court has previously held indirect comments that seemed to implicate the defendant's failure to testify were not

14

improper if they occurred within the discussion of a videotaped statement. *State v. Ninci*, 262 Kan. 21, 47-49, 936 P.3d 1364 (1997). In *Ninci*, the court found the statement "'[t]he only evidence that you have out of [defendant]'s mouth is that he didn't know what Glen was going to do'" was not of such character that the jury would necessarily have understood it to be a comment on the defendant's failure to testify. 262 Kan. at 48-49. Furthermore, given the statement was made within the context of a discussion of the defendant's videotaped statement, the comment was meant to indicate he never made any other statement in that interview. 262 Kan. at 48-49.

The State in this case advocates a similar argument—the prosecutor's comment, in context, was clearly a reference to Buberwa's taped interview with Detective Brown, which was shown at trial. The difference here, though, is prosecutor's comment addresses Buberwa's unwillingness to admit something to the jury. At the time of the interview, Buberwa could not have had such intentions because there was no jury to admit things to. While indirect, the prosecutor's comment seems to indicate Buberwa is unwilling to address the jury, and the jury could have understood this as a reference to Buberwa's failure to testify.

If the prosecutor's statement was a comment on Buberwa's failure to testify, it would constitute misconduct for the purposes of this analysis, but the comment was unlikely to have prejudiced the jury or denied Buberwa a fair trial. The prosecutor's comment was indirect and isolated. Additionally, the State notes the prosecutor was responding to defense counsel's closing statement, in which defense counsel emphasized that Buberwa had adamantly denied having any sexual intentions. Thus, the prosecutor's comment, while possibly constituting misconduct, does not appear to be gross or flagrant or inspired by ill will. Moreover, the evidence of Buberwa's guilt was also substantial. B.K.M.'s testimony was corroborated in part by N.R., Page, K.P., and even Buberwa himself. While some details differed between the witnesses, the main events were consistent. The court also instructed the jury that Buberwa had a constitutional right not to testify and no negative inference should be drawn from his refusal to testify. Thus,

15

given the strength of the evidence and the instructions given by the court, the prosecutor's comment likely had no effect on the jury's verdict.

*Misstatement of Facts and Law Regarding Buberwa's Voluntary Intoxication*

Buberwa next argues the prosecutor misstated the facts and the law regarding Buberwa's voluntary intoxication defense. First, he claims the prosecutor's comments were "a misstatement of the evidence because, even as she said herself, Mr. Buberwa did not claim that he was blacked out." Specifically, Buberwa points to when the prosecutor said, "Later on in that same interview Detective Brown asked, Well did you think you were blacking out? And the defendant, Ray, says, Well, it's not a blackout. Goes on, says a little bit more. He says, Well, confused but not a blackout . . . . And I would submit to you in this situation that what the defendant did, what he's described is not a blackout." This argument is without merit. If Buberwa did not claim he was blacked out and the prosecutor said so herself, then obviously she did not misstate the evidence.

Buberwa further argues the prosecutor misstated the law because she said a blackout is required for a voluntary intoxication defense. He claims her statement, "[I]f he wasn't blacked out . . . then that voluntar[y] intoxication doesn't hold any water," followed by the statement, "[W]hat he described isn't a blackout," or a knowing misstatement of the law. The State argues the prosecutor's comments, taken in context, cited Buberwa's admission that he did not blackout as one relevant fact demonstrating his voluntary intoxication defense was not viable. The prosecutor also noted Buberwa remembered a number of details of before and after the incident, casting further doubt on this defense.

Because it is the duty of the prosecutor in a criminal matter to see that the State's case is properly presented with earnestness and vigor and to use every legitimate means to bring about a just conviction, prosecutors are given wide latitude in arguing the cases

16

before them. *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009). When a misstatement of controlling law is made deliberately, however, it is outside the considerable latitude given to prosecutors during their arguments. *State v. Gunby*, 282 Kan. 39, 63, 144 P.3d 647 (2006). In countering a voluntary intoxication defense, the prosecutor may comment on a defendant's ability to reason, to plan, to recall, and to exercise motor skills because these demonstrate the defendant's ability or inability to form intent. See *State v. Betancourt*, 299 Kan. 131, 141-42, 322 P.3d 353 (2014). This court has also found failure to explain the law of voluntary intoxication with certitude is not necessarily misconduct as long as it falls within the wide latitude granted to prosecutors. *State v. Esher*, No. 88,343, 2003 WL 22005897, at *4 (Kan. App. 2003) (unpublished opinion), *rev. denied* 276 Kan. 971 (2003).

Here, the prosecutor appears to be citing Buberwa's lack of a blackout as one factor negating his voluntary intoxication defense. Her primary point appears to be that Buberwa was able to remember details of before and after the event which negated his defense. This is demonstrated by her references to what Buberwa claims he can and cannot remember about the incident. Since an ability to remember would indicate an ability to form intent, it would counter Buberwa's voluntary intoxication defense. Furthermore, nothing indicates the prosecutor was deliberately attempting to mislead the jury as to the law regarding voluntary intoxication. Thus, the prosecutor's statement regarding the law on voluntary intoxication was correct or, at the very least, was close enough that it was within the wide latitude granted to prosecutors in arguing their cases.

Even if the prosecutor's statements were a misstatement of the law, the error was almost certainly harmless. The court gave the jury a proper instruction on voluntary intoxication and an instruction that the arguments of counsel are not evidence. Also, as noted above, the evidence against Buberwa was substantial.

Because the prosecutor's statements on voluntary intoxication were within the wide latitude granted to prosecutors and any error resulting from them was harmless, they

17

did not constitute prosecutorial misconduct. The prosecutor's statements regarding Buberwa's failure to testify may have been misconduct but any resulting error was harmless. Because any possible misconduct by the prosecutor was harmless error, prosecutorial misconduct did not deny Buberwa a fair trial.

Finally, Buberwa argues the cumulative effect of the above errors denied him a fair trial. Under the cumulative error test, courts analyze whether the totality of the circumstances establish the defendant was substantially prejudiced by cumulative errors and was thus denied a fair trial. In assessing the cumulative effect of errors during the trial, the appellate court examines the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). The court will find no cumulative error when the record fails to support the errors defendant raises on appeal. *Betancourt*, 299 Kan. at 147. A single error cannot constitute cumulative error. *Williams*, 299 Kan. at 566.

In this case, the only possible error was the prosecutor's comment on Buberwa's failure to testify. Buberwa's multiplicity claim is not properly before us, and the totality of the circumstances establish the convictions were not multiplicitous. Buberwa may not rely on any error regarding the intent instruction because it was invited error. The prosecutor's statements regarding voluntary intoxication were also a correct statement of law. Because a single error cannot constitute cumulative error, Buberwa was not denied a fair trial and his convictions are affirmed.

Affirmed.

* * *

MALONE, C.J., concurring: I concur in the result.

18